## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CTS HOLDINGS, LLC,

　　　　　　　　　Interpleader,

　　　v.

L60, INCORPORATED, PIPELINE DATA INC.,
AND VALADATA, INC.,

　　　　　　　　　Claimants.

Civil Action No.

## COMPLAINT OF CTS HOLDINGS, LLC
## IN INTERPLEADER FILED UNDER SEAL

Interpleader, CTS Holdings, LLC ("**CTS**"), by and through its undersigned counsel, Fox Rothschild LLP, hereby files a complaint in interpleader against claimants, L60, Incorporated ("**L60**"), Pipeline Data Inc. ("**Pipeline**") and Valadata, Inc. ("**Valadata**") (collectively, the "**Claimants**"), all of whom claim entitlement to funds that CTS currently holds. In support of its complaint, CTS states as follows:

### PARTIES

1.　　CTS is a limited liability company organized under the laws of the State of Colorado with a principal place of business at 6200 South Quebec Street, Suite 260A, Greenwood Village, Colorado, 80111.

2.　　CTS is an entity affiliated with National Payment Systems, Inc., d/b/a Card Payment Systems ("**CPS**").

3.    L60 is a corporation organized under the laws of the State of Arizona with a principal place of business at 9633 S. 48th Street, Suite 100, Phoenix, Arizona 85044, and a registered agent at 4101 E. Redwood Lane, Phoenix, Arizona 85048.

4.    Pipeline is a corporation organized under the laws of the State of Delaware with a principal place of business at 1515 Hancock Street, Suite 301, Quincy, Massachusetts 02169, and a registered agent at 108 West 13th Street, Wilmington, DE 19801.

5.    Valadata is a corporation organized under the laws of the State of North Dakota with a principal place of business at 9633 S. 48th Street, Suite 100, Phoenix, Arizona 85044, and a registered agent at 1800 Radisson Tower, 201 N. 5th Street, Fargo North Dakota, 58102.

6.    Valadata is a wholly-owned subsidiary of Pipeline.

## JURISDICTION AND VENUE

7.    Under 28 U.S.C. § 1335, this Court has subject matter jurisdiction over these proceedings because the amount in controversy exceeds $500.00 (CTS has deposited the funds at issue into the registry of the Court) and complete diversity exists between CTS and the Claimants.

8.    This Court has personal jurisdiction over the Claimants under 28 U.S.C. § 2361, which provides for nationwide service of process in interpleader actions.

9.    Venue is proper with this Court under 28 U.S.C. § 1397 because Pipeline resides in the State of Delaware.

## FACTUAL BACKGROUND

10.

REDACTED

11.

REDACTED

12.

REDACTED

13.

REDACTED

14.

REDACTED

3

15.

**REDACTED**

16.

**REDACTED**

17.

**REDACTED**

18.

**REDACTED**

19.

**REDACTED**

20.

**REDACTED**

### The Arizona State Court Action

21.    On or about September 13, 2007, in the Superior Court of the State of Arizona, County of Maricopa, L60 filed a complaint against Pipeline and Valadata, and alleges claims for breach of a promissory note, foreclosure of a security interest, and breach of contract against Pipeline and Valadata (the "**Arizona Action**").  A true and correct copy of the complaint filed by L60 in the Arizona Action is attached hereto as Exhibit "E".

22.    In the Arizona Action, L60 alleges that, on or about July 10, 2006, L60 and Pipeline entered into an Agreement and Plan of Merger (the "**Merger Agreement**"), under which Valadata merged with Valadata Acquisition, Inc., a wholly owned subsidiary of Pipeline. According to the Merger Agreement, Valadata was the surviving corporation.  See Arizona Action at ¶ 10.  A true and correct copy of the Merger Agreement is attached hereto as Exhibit "F".

23.    In the Arizona Action, L60 further avers that in the Merger Agreement, Pipeline agreed to pay L60 the total purchase price of $7,043,679.45, in three (3) installments:   (1) $5,478,471.35 at closing of the Merger Agreement (the "**First Installment**"); (2) $782,631.05 on the first anniversary of the closing of the Merger Agreement (the "**Second Installment**"); and (3) $782,631.05 on the second anniversary of the closing of the Merger Agreement (the "**Third Installment**").  See Arizona Action at ¶ 11.

24.    Pipeline paid L60 the First Installment in the amount of $5,478,471.35.  See Arizona Action at ¶ 13.

25.    To evidence its obligation to pay the Second Installment and Third Installment under the Merger Agreement, on or about July 10, 2006, Pipeline executed and delivered to L60

5

a Second and Third Installment Secured Promissory Note (the "**Note**"). A true and correct copy of the Note dated July 10, 2006 is attached hereto as Exhibit "G".

26.    To secure Pipeline's obligations under the Second Installment and Third Installment under the Note, on or about July 10, 2006, Valadata executed and delivered to L60 a Second and Third Installment Security Agreement (the "**Security Agreement**"). A true and correct copy of the Security Agreement dated July 10, 2006 is attached hereto as Exhibit "H".

27.    The Security Agreement specifically provides:

> To secure the payment of all Obligations (as hereafter defined), we hereby grant to you a continuing security interest in all of the following property now owned or at any time hereafter acquired by Valadata, Inc., or in which Valadata, Inc. now has or at any time in the future may acquire any right, title or interest (the "Collateral"): all cash, accounts, accounts receivable, deposit accounts (including, without limitation, inventory, equipment, goods, documents, instruments (including, without limitation, promissory notes), contract rights, general intangibles (including, without limitation, payment intangibles and an absolute right to license on terms no less favorable than those currently in effect among our affiliates, but not own intellectual property), chattel paper, supporting obligations, investment property, letter-of-credit rights, trademarks and tradestyles in which Valadata, Inc. now has or hereafter may acquire any right, title or interest, all proceeds and products thereof (including, without limitation, proceeds of insurance) and all additions, accessions and substitutions thereto or therefore.

See Security Agreement at ¶ 1.

28.    According to the Security Agreement, L60 and Valadata agreed to execute and file Uniform Commercial Code financing statements ("**UCC-1 Statements**") to perfect L60's security interest under the Security Agreement. See Security Agreement at ¶ 8.

29.    Valadata and L60 filed two UCC-1 Statements, one in the State of Delaware which named Valadata Acquisition, Inc. as the debtor and one in the State of North Dakota which named Valadata as the debtor. A true and correct copy of the UCC Statements are collectively attached hereto as Exhibit "I".

30.    L60 alleges that Pipeline has refused to pay L60 the Second Installment and Third Installment under the Merger Agreement, as secured by the Security Agreement and evidenced by the Note. See Arizona Action at ¶ 14.

31.    In the Arizona Action, L60 further alleges that an Event of Default has occurred under the Note and, as such, L60 alleges that it is entitled to enforce its rights under the Security Agreement. See Arizona Action, ¶ 21.

32.    Under the Security Agreement, L60 seeks, among other items,

## L60 Demands CTS To Pay L60 Accounts Receivable Owed To Valadata

33.    In a letter dated September 13, 2007, L60 wrote to First Data Corporation ("**FDC**"), an entity affiliated with CTS, and asserted that L60 had a security interest in any of Valadata's accounts receivable. A true and correct copy of the September 13, 2007 letter to First Data Corporation is attached hereto as Exhibit "J".

34.    L60 further requested in its September 13 letter that CTS pay over to L60 any of Valadata's accounts receivable in CTS's possession because Pipeline defaulted on the Note.

35.                                                              represent Valadata's accounts receivable in CTS's possession that CTS would otherwise pay to Valadata but for L60's competing claim to these funds.

## The Interpleader Action

36.    CTS is the successor-in-interest to CPS with respect to

                                                          . As such, CTS has possession, custody and control of the funds that Claimants allege they are entitled to receive from CTS.

7

37.    L60 has demanded that CTS forward to L60 any payments that CTS may owe to Valadata. The only payments that CTS may owe to Valadata are

38.    In a letter dated September 21, 2007, FDC notified L60 that CTS did not want to be entangled in the dispute between and among Valadata, L60 and Pipeline. CTS advised L60 that CTS planned to withhold                                    that CTS would otherwise pay to Valadata. A true and correct copy of the September 21, 2007 letter to L60 is attached hereto as Exhibit "K".

39.    In a letter dated September 21, 2007, FDC advised Pipeline that, based on L60's demand for funds otherwise owed by CTS to Valadata, CTS planned to withhold

· owed to Valadata until L60 confirmed that it was no longer asserting a claim for such amounts. A true and correct copy of the September 21, 2007 letter to Pipeline is attached hereto as Exhibit "L".

40.    In response to L60's demand on CTS, Pipeline has consistently maintained that                                    owed to Valadata should be paid to Valadata, not L60.

41.    To date, CTS has withheld                                    in the amount of $355,095.62.

42.    CTS is a stakeholder and does not assert any claim to                                    , other than its attorney's fees that may be awarded by the Court in the Interpleader Action. As such, with respect to ·                                    ·, CTS is faced with multiple claims and the potential for inconsistent results.

## COUNT I – Statutory Interpleader

43.    CTS incorporates by reference each and every allegation contained in the preceding paragraphs 1 through 42 as if set forth herein.

44.    CTS has performed its obligations under

45.    There are                                                                    ( in the amount of $355,095.62. Going forward                    , CTS anticipates that (

will accrue.

46.    Under 28 U.S.C. § 1335, a party is entitled to relief by interpleader if such party is in possession of money or property and two or more adverse claimants allege entitlement to that money or property.

47.    L60, Pipeline and Valadata each claim that they are entitled to

that CTS has withheld, as well as .

48.    CTS is a stakeholder faced with multiple claims for the distribution of

in the amount of $355,095.62, as well as

49.    CTS has not asserted any interest in

and has, at all times, been willing to pay such amounts to the entity that is lawfully entitled to them.

50.    CTS has not colluded with any of the parties regarding this dispute. CTS filed this complaint solely to avoid potentially multiple liability and inconsistent results. CTS has not unreasonably delayed in commencing these proceedings.

9

51.     Contemporaneous with filing the Interpleader Action, CTS deposited

in the amount of $355,095.62 into the registry of

the Court. In doing so, CTS agrees to abide by the judgment of the Court with respect to

that may be deposited in the future.

52.     CTS respectfully requests that the Court discharge CTS from the lawsuit and enter

an order relieving CTS of all claims made by the Claimants, other than requiring CTS to

continue to make                                                    into the registry of the

Court until such time as the Court directs otherwise.

## COUNT II – Injunctive Relief

53.     CTS incorporates by reference each and every allegation contained in the

preceding paragraphs 1 through 52 as if set forth herein.

54.     Under 28 U.S.C. § 2361, the Court may enter an order restraining Claimants from

instituting or prosecuting any proceeding in any state or federal court with respect money or

property in dispute.

55.     CTS respectfully requests that the Court enter an order restraining Claimants from

instituting or prosecuting any proceeding in any state or federal court including, but not limited

to, the Arizona Action, with respect to

## COUNT III – Attorney's Fees And Costs

56.     CTS incorporates by reference each and every allegation contained in the

preceding paragraphs 1 through 55 as if set forth herein.

10

57.    CTS is an innocent and disinterested stakeholder in this action. CTS does not dispute that                                                    . are due and owing. Contemporaneous with instituting the Interpleader Action, CTS deposited .

                                            into the registry of the Court, and thus, CTS seeks to be discharged from the adverse claims described here.

58.    As a result of its exposure to multiple liability and inconsistent results, CTS has been forced to retain the undersigned counsel to file this complaint. CTS has agreed to pay the undersigned counsel a reasonable fee for its necessary services in the Interpleader Action.

59.    CTS respectfully requests that the Court award CTS its reasonable attorney's fees and costs that it has incurred as a result of instituting these proceedings.

**WHEREFORE**, interpleader, CTS Holdings, LLC, respectfully requests that the Court order claimants, L60, Inc., Pipeline Data, Inc. and Valadata, Inc., to appear and answer herein and that the Court enter an order awarding the following relief:

1.    An order discharging CTS Holdings, LLC from the adverse claims for

2.    An order permitting CTS Holdings, LLC to continue to deposit
      Rev. . . .                                        . if any, into the registry of the Court until otherwise directed by this Court;

3.    An order restraining L60, Inc., Pipeline Data, Inc. and Valadata, Inc. from instituting or prosecuting any proceeding in state or federal court with respect to ·

4.    An order awarding CTS Holdings, LLC its reasonable and necessary attorney's fees incurred in connection with these proceedings;

5.    An order awarding CTS Holdings, LLC its costs of Court incurred in connection with these proceedings; and

11

6.    Such other relief as the Court may deem to be just and proper.

\s\ Gregory B. Williams
Gregory B. Williams, Esquire (Id. No. 4195)
Fox Rothschild LLP
Citizens Bank Center
919 North Market Street
Suite 1300, 13th Floor
Wilmington, DE 19801-2323
(302) 654-7444
(302) 656-8920 (facsimile)

Attorneys for Interpleader
CTS Holdings, LLC

Dated: December 14, 2007

OF COUNSEL:

Scott L. Vernick, Esquire
Joshua Horn, Esquire
Fox Rothschild LLP
2000 Market Street, Tenth Floor
Philadelphia, PA 19103
(215) 299-2000
(215) 299-2150 (facsimile)

Attorneys for Interpleader
CTS Holdings, LLC

Exhibit "A"

Document Filed
Under Seal

Exhibit "B"

Document Filed
Under Seal

Exhibit "C"

Document Filed
Under Seal

Exhibit "D"

Document Filed
Under Seal

Exhibit "E"

1    Quarles & Brady LLP
     Firm State Bar No. 00443100
2          Renaissance One
       Two North Central Avenue
3      Phoenix, Arizona 85004-2391
         TELEPHONE 602.229.5200

4    Attorneys for Plaintiff

5    Scott A. Klundt (012234)

6

7         IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

8            IN AND FOR THE COUNTY OF MARICOPA

9

10   | L60, INCORPORATED, an Arizona corporation, | NO. |

11        Plaintiff,

12        vs.                                    **COMPLAINT**

13   PIPELINE DATA INC., a Delaware
14   corporation; VALADATA, INC., a North
     Dakota corporation; and JOHN DOES I-X,
15
          Defendants.
16

17        For its Complaint against Defendants, Plaintiff alleges as follows:

18                              **PARTIES**

19        1.    Plaintiff, L60, Incorporated ("L60"), is a corporation duly organized and

20   existing pursuant to the laws of the State of Arizona and is authorized to do, and is doing,

21   business in Maricopa County, Arizona.

22        2.    On information and belief, Defendant Pipeline Data Inc. ("Pipeline") is a

23   corporation duly organized and existing pursuant to the laws of the State of Delaware and

24   has caused events to occur in Maricopa County out of which L60's claims arise.

25        3.    On information and belief, Defendant Valadata, Inc. ("Valadata") is a

26   corporation duly formed and existing pursuant to the laws of the State of North Dakota,

QBPHX\127190.00002\2121062.1

1    which is authorized to do and is doing business in Maricopa County, Arizona.

2        4.    John Does I-X are fictitious persons or entities who may have an interest

3    herein. As such time as the true name of these defendants becomes known to L60, it will

4    amend its pleadings to reflect this information.

5                            **JURISDICTION AND VENUE**

6        5.    This Court has subject matter jurisdiction over this case pursuant to the

7    Arizona Constitution and A.R.S. § 12-123.

8        6.    This Court has personal jurisdiction over Defendants because they are doing

9    business and/or reside and/or have consented to the jurisdiction of the state courts located

10   in Maricopa County, Arizona.

11       7.    Venue in Maricopa County is proper pursuant to A.R.S. § 12-401.

12   Furthermore, Defendants have consented to venue in Maricopa County.

13                            **FIRST CLAIM FOR RELIEF**
                         (Breach of Contract -- Promissory Note)
14

15       8.    L60 incorporates and realleges the allegations contained in paragraphs 1-7

16   as though such allegations were fully set forth herein.

17       9.    As of July 10, 2006, L60 was the sole shareholder of Valadata.

18       10.   On or about July 10, 2006, L60 and Pipeline entered into an Agreement and

19   Plan of Merger (together with all amendments thereto, the "Agreement"), pursuant to

20   which Valadata merged with Valadata Acquisition, Inc., a wholly owned subsidiary of

21   Pipeline. Pursuant to the Agreement, Valadata was the surviving corporation.

22       11.   As consideration for the transactions contemplated in the Agreement,

23   Pipeline agreed to pay to L60 a total purchase price of up to $7,043,679.45, in three

24   installments: an initial installment in the amount of $5,478,417.35, to be paid upon the

25   closing of the Agreement, and two subsequent installments in the amount of $782,631.05

26   each, to be paid upon the first and second anniversaries of the closing.

1      12.  On or about July 10, 2006, to evidence its obligation to make the second and

2  third installments, Pipeline executed and delivered to L60 a Second and Third Installment

3  Secured Promissory Note (the "Note").

4      13.  Pipeline paid the initial installment in the amount of $5,478,417.35 to L60.

5      14.  On August 16, 2007, Pipeline sent a letter to L60 asserting that Pipeline was

6  no longer obligated to pay any further installments under the Agreement and the Note and

7  would not pay any further installments under the Agreement and the Note.

8      15.  L60 has performed all of its obligations under the Agreement and the Note.

9      16.  Pursuant to the terms of the Note, Pipeline's failure to pay the second

10  installment constitutes an Event of Default.

11      17.  Pursuant to the Note, upon the occurrence of an Event of Default, all

12  amounts remaining to be paid under the Note become immediately due and payable.

13      18.  The Agreement provides that, in connection with any action to enforce or

14  interpret the Agreement, the prevailing party shall be entitled to recover from the other

15  party all reasonable attorneys' fees incurred by the prevailing party connection with such

16  action.  Accordingly, if L60 is the prevailing party in this matter, L60 will be entitled to

17  recover its reasonable attorneys' fees. L60 also is entitled to an award of its attorneys' fees

18  and costs under A.R.S. §12-341.01.

19      WHEREFORE, L60 respectfully requests the Court to enter judgment against

20  Pipeline Data, Inc., as follows:

21      A.  For the principal sum of $1,565,262.10;

22      B.  For interest on the foregoing sum at the highest lawful rate from July 10,

23  2007, until paid in full;

24      C.  For L60's attorneys' fees and court costs incurred in this matter, with interest

25  thereon at the highest lawful rate from the entry of judgment herein until paid in full; and

26      D.  For such other and further relief as the Court deems just and proper.

1

2

**SECOND CLAIM FOR RELIEF**
(Foreclosure of Security Interest)

3

4

19.    L60 incorporates and realleges the allegations contained in paragraphs 1-18 as though such allegations were fully set forth herein.

5

6

7

8

9

20.    On or about July 10, 2006, as security for the payment of the obligations owed by Pipeline to L60 under the Note, Valadata executed and delivered to L60 a Second and Third Installment Security Agreement (the "Security Agreement"), pursuant to which Valadata granted to L60 a security interest in all of Valadata's assets, including all accounts and accounts receivable (the "Collateral").

10

11

12

21.    Pursuant to the terms of the Security Agreement and the Uniform Commercial Code, as a result of Pipeline's default, L60 is entitled to immediate possession of the Collateral and is entitled to sell or otherwise dispose of the Collateral.

13

14

22.    John Does I-X are persons or entities who may have possession of, or claim an interest in, all or part of the Collateral.

15

16

17

18

23.    The Security Agreement also provides that Valadata shall pay all of L60's costs and expenses, including attorneys' fees and other legal expenses, incurred in connection with L60's enforcement of the Security Agreement. L60 also is entitled to recover its attorneys' fees and costs pursuant to A.R.S. §12-341.01.

19

WHEREFORE, L60 respectfully demands the following relief:

20

21

22

23

24

25

A.    For judgment in favor of L60 and against Defendants, which provides that L60 is, and was at the time of the filing of this Complaint, entitled to the immediate possession of the Collateral, and that L60 is further entitled to sell or otherwise dispose of said Collateral and apply the proceeds of any such disposition to the indebtedness due and owing by Defendants to L60; and for a Writ of Special Execution requiring Defendants to deliver possession of the Collateral to L60;

26

B.    For L60's reasonable attorneys' fees and other legal expenses;

1    C.    For L60's costs incurred herein and accruing costs;

2    D.    For interest on said attorneys' fees, legal expenses, and costs at the

3    highest rate permitted by law from the date of judgment herein until paid in full; and

4    E.    For such other and further relief as the Court may deem just and

5    proper under the circumstances.

6    **THIRD CLAIM FOR RELIEF**

7    (Breach of Contract -- Agreement)

8    24.    L60 incorporates and realleges the allegations contained in paragraphs 1-18

9    as though such allegations were fully set forth herein.

10    25.    As part of the Agreement, Pipeline agreed to remit to L60 the revenues

11    received in connection with the servicing of accounts in two portfolios, identified as

12    "CA2" and "SK2."

13    26.    In particular, upon the completion of 12 months of servicing the accounts in

14    those two portfolios, Pipeline agreed to pay L60 75% of the revenue received thereafter in

15    connection with the servicing of those accounts.

16    27.    L60 has performed all of its obligations under the Agreement.

17    28.    Pipeline has serviced the accounts in the two portfolios for more than 12

18    months.

19    29.    Pipeline has breached the Agreement by failing to remit to L60 75% of the

20    revenue received in connection with the servicing of those accounts after completion of

21    the 12-month period.

22    30.    As a result of Pipeline's breach, L60 has been damaged in an amount to be

23    proven at trial.

24    31.    Pursuant to the terms of the Agreement, if L60 is the prevailing party in this

25    matter, L60 will be entitled to recover its reasonable attorneys' fees. L60 also is entitled

26    to an award of its attorneys' fees and costs under A.R.S. §12-341.01.

1    WHEREFORE, L60 respectfully requests the Court to enter judgment against

2  Pipeline Data, Inc., as follows:

3    A.    For compensatory damages in an amount to be proven at trial, with interest

4  thereon at the highest lawful rate from the date such damages were due until paid in full;

5    B.    For L60's attorneys' fees and court costs incurred in this matter, with interest

6  thereon at the highest lawful rate from the entry of judgment herein until paid in full; and

7    C.    For such other and further relief as the Court deems just and proper.

8

9    DATED this 13th day of September, 2007.

10    QUARLES & BRADY LLP
      Two North Central Avenue
11    Phoenix, AZ 85004-2391
      Attorneys for L60
12
      By
13    Scott A. Klundt

14

15

16

17

18

19

20

21

22

23

24

25

26

Exhibit "F"

**AGREEMENT AND PLAN OF MERGER**

**by and among**

**PIPELINE DATA INC.**

**VALADATA ACQUISITION, INC.**

**VALADATA, INC.**

**and**

**THE SHAREHOLDERS OF VALADATA, INC.**

**July _ID_ , 2006**

## EXHIBITS

Exhibit A     List of Shareholders
Exhibit B     Certificate of Merger
Exhibit C     Certificate of Incorporation
Exhibit D     Bylaws
Exhibit E     Note
Exhibit F     Security Agreement
Exhibit G     Confidentiality and Non-circumvention Agreement
Exhibit H     Schedule of Exceptions

## AGREEMENT AND PLAN OF MERGER

This Agreement and Plan of Merger dated as of July _/ᶜᵕ_ 2006 (this "Agreement") is entered into by and among Pipeline Data Inc., a Delaware corporation ("PPDA"), Valadata Acquisition, Inc., a Delaware corporation and wholly owned subsidiary of PPDA (the "Purchaser"), Valadata, Inc., a North Dakota corporation (the "Company"), the shareholders of the Company as indicated on Exhibit A hereto (the "Shareholders") and L60, Incorporated, an Arizona corporation.

### RECITALS

A.      The Company, the Shareholders, PPDA and the Purchaser believe it advisable and in their respective best interests to effect a merger of the Company and the Purchaser pursuant to this Agreement (the "Merger").

B.      The Board of Directors of the Company and the Shareholders have approved the Merger as required by applicable law.

C.      The Board of Directors and the sole shareholder of the Purchaser have approved the Merger as required by applicable law.

### AGREEMENT

In consideration of the terms hereof, the parties hereto agree as follows:

### ARTICLE I - THE MERGER

### 1.1     The Merger

Upon the terms and subject to the conditions hereof, (a) at the Effective Time (as defined in Section 1.3) the separate existence of the Purchaser shall cease and the Purchaser shall be merged with and into the Company (the Company is sometimes referred to herein as the "Surviving Corporation"), and (b) from and after the Effective Time, the Merger shall have all the effects of a merger under the laws of the State of North Dakota and Delaware and other applicable law.

### 1.2     The Closing

The closing of the Merger pursuant to this Agreement (the "Closing") shall take place on the earliest practicable business day after the conditions to the Closing of the Merger set forth in Articles V and VI are satisfied or waived but in all events no

later than July 1, 2006 (the "Closing Date") at 10 a.m. local time at the Massachusetts offices of PPDA, or such other time or location as PPDA and the Company shall agree. At the Closing, each of the parties hereto shall deliver all such documents, instruments, certificates and other items as may be required under this Agreement or the other Related Documents (as defined in Section 2.2(b)) or otherwise.

## 1.3    Effective Date and Time

On the Closing Date and subject to the terms and conditions hereof, articles or certificates of merger (collectively, the "Articles of Merger") complying with the applicable provisions of North Dakota Century Code ("North Dakota Law") and the Delaware General Corporation Law ("Delaware Law"), as applicable, in substantially the form or forms attached hereto as Exhibit B, and in such form and executed in such manner as required by North Dakota Law and Delaware Law, as applicable, shall be delivered for filing to the Secretary of State of the State of North Dakota (the "North Dakota Secretary of State") and the Secretary of State of the State of Delaware (the "Delaware Secretary of State"). The Merger shall become effective on the date (the "Effective Date") and at the time (the "Effective Time") of filing of the Articles of Merger or at such other time as may be specified in the Articles of Merger as filed. If the North Dakota Secretary of State or the Delaware Secretary of State, as the case may be, requires any changes in the Articles of Merger as a condition to its filing or to issuing its certificate to the effect that the Merger is effective, PPDA, the Purchaser, the Company and the Shareholders will execute any necessary revisions incorporating such changes, provided such changes are not inconsistent with and do not result in any substantial change in the terms of this Agreement.

## 1.4    Articles of Incorporation of the Surviving Corporation

At the Effective Time, the Articles of Incorporation of the Company shall be in the form attached hereto as Exhibit C and shall be the Articles of Incorporation of the Surviving Corporation. Thereafter, the Articles of Incorporation of the Surviving Corporation may be amended in accordance with their terms and as provided by law.

## 1.5    Bylaws of the Surviving Corporation

At the Effective Time, the Bylaws of the Company shall be in the form attached hereto as Exhibit D and shall be the Bylaws of the Surviving Corporation. Thereafter, the Bylaws may be amended or repealed in accordance with their terms, the terms of the Articles of Incorporation of the Surviving Corporation and as provided by law.

-2-

## 1.6    Merger Consideration; Surrender of Certificates

### 1.6.1  Merger Consideration

As of the Effective Time, by virtue of the Merger and without any action on the part of the holders thereof:

(a)    All shares of any class of capital stock of the Company held by the Company as treasury shares shall be canceled.

(b)    Each issued and outstanding share of capital stock of the Company (the "Shares") shall be converted into the right to receive from PPDA the Per Share Merger Consideration. The "Per Share Merger Consideration" shall mean an amount equal to the Merger Consideration divided by the number of Shares. The "Merger Consideration" shall mean the Closing Consideration (as defined in Section 1.6.1(c)(i) hereof), subject to the Purchase Price Installment Adjustment (as defined in Section 1.6.1(c)(ii) hereof).

(c)    For purposes of Section 1.6.1(b), the following shall apply:

(i)    The "Closing Consideration" shall mean:

a.    The sum of the average monthly residual payments received by the Company during the twelve (12) month period commencing on March 1, 2005 and ending February 28, 2006 and the average monthly payments received by the then owners of the Residual Repurchases during the same twelve (12) month period, all multiplied by a factor of forty-five (45) (the "Purchase Price"). The current estimation of the twelve (12) month average residual payment amounts with the income amounts from the Residual Repurchases added (the "Target Income") is US$207,058.58 and will be adjusted in accordance with this Agreement at the Closing. The Purchase Price shall be payable in accordance with Section 1.6.1 (c)(i)(b) hereof and subject to the Purchase Price Installments adjustment as set forth in Section 1.6.1 (c)(ii) hereof.

b.    The Purchase Price shall be made in three (3) installments (the "Installments") as follows: an initial payment at the Closing in an amount equal to thirty-two (32) times the Target Income; a second payment on the first anniversary of the Closing Date in an amount equal to seven (7) times the Target

-3-

Income (the "<u>Second Installment</u>"); and a third payment on the second anniversary of the Closing Date in an amount equal to six (6) times the Target Income (the "<u>Third Installment</u>"). Notwithstanding the forgoing payment structure, the Purchase Price is subject to a Purchase Price Installments adjustment as set forth in Section 1.6.1 (c)(ii) hereof.

(ii)    The parties agree to provide the following Purchase Price Installments adjustment (the "<u>Adjustment</u>"). The Adjustment shall be based on the Qualifying Income, which shall be defined to mean the income (x) from the accounts owned by the Company as of the Closing and (y) from certain portfolios of the Buckets, LLC ("<u>Buckets</u>") ISO Agreement, L60, Incorporated. ISO Agreements and other portfolios, all as more fully described in Section 1.8 hereof; provided, however, that if an account owned by the Company as of the Closing terminates its contract with the Surviving Corporation within three (3) months following the Surviving Corporation's imposition of an annual fee on the account, the income received from the terminated account in the last twelve (12) months prior to the termination shall be deemed income for purposes of calculating the Qualifying Income.

(a)    If the Qualifying Income for the last twelve months ending on the first anniversary of the Closing Date is more than 15% lower than the Target Income as of the Closing, PPDA shall have no obligation to pay any further Installments.

(b)    If the Qualifying Income for the last twelve months ending on the second anniversary of Closing Date is more than 15% lower than the Target Income as of the Closing, PPDA shall have no obligation to pay the Third Installment.

## 1.6.2  Surrender of Certificates

At Closing, the Shareholders shall surrender to PPDA certificates representing all of the stock in the Company with executed stock powers along with all of the books and records of the Company.

## 1.6.3  No Further Transfers

At the Effective Time, PPDA shall be the sole owner of the Surviving Corporation. If, after the Effective Time, certificates formerly representing shares or shares of other capital stock of the Company held prior to the Effective Time, are

-4-

presented to the Surviving Corporation, they shall be forwarded to PPDA and be canceled.

## 1.7    Residual Liability Repurchases

(a)    The Company shall repurchase certain residual liabilities prior to Closing ("Residual Repurchases"). PPDA shall provide a secured loan facility to the Company for these purposes in an amount not to exceed US$2,000,000 (the "Loan Facility"). Interest on the Loan Facility shall accrue at 18% per annum. The Loan Facility shall be collateralized by a properly perfected security interest in the Company's residual income.

(b)    Prior to funding, the Company shall identify the target Residual Repurchases to PPDA and shall present PPDA with all Residual Repurchase transaction documentation as PPDA requires. Should the target Residual Repurchase, the terms of the transaction and the transaction documentation be acceptable to PPDA in its sole discretion, PPDA shall then fund at Closing.

(c)    At Closing, any and all amounts outstanding under the Loan Facility shall be repaid to PPDA by set-off from the Purchase Price.

## 1.8    ISO Processing Agreement with Buckets, LLC and L60, Incorporated

(a)    At Closing, PPDA will enter into an Independent Sales Organization Processing Agreement (the "ISO Agreement") with Buckets and/or L60, Incorporated in connection with two portfolios hereby identified as "CA2" and "SK2".

(b)    Prior to or on the first anniversary of Closing, Buckets and L60, Incorporated can elect to assign PPDA accounts from these portfolios and other portfolios of equal quality to make up for attrition losses as described in Section 1.6.1(c)(ii) hereof. Revenue from portfolios not transferred but serviced pursuant to the ISO Agreement with Buckets or L60, Incorporated shall be subject to 75%-Buckets (or L60)/25%-PPDA revenue split after 12 months of servicing by Buckets and/or L60, Incorporated.

## ARTICLE II - REPRESENTATIONS AND WARRANTIES OF THE COMPANY AND THE SHAREHOLDERS

The Company and each Shareholder hereby jointly and severally represent and warrant to the Purchaser and PPDA as follows in this Article II, subject to the exceptions set forth in the Schedule of Exceptions attached hereto as Exhibit H (the "Schedule of Exceptions") (each of which exceptions shall specifically identify the provision or provisions of this Article II to which such exception relates); provided,

however, that each Shareholder represents and warrants with respect to
Sections 2.2(b) and (c) and 2.27 only with respect to himself.

## 2.1    Organization and Good Standing

(a)    The Company is a corporation duly organized, validly existing
and in good standing under the laws of the State of North Dakota. The Company has
no subsidiaries. The Company has all requisite corporate power and authority to own,
lease and operate its properties and assets and to carry on its business as now
conducted. The Company is qualified to do business as a foreign corporation in the
jurisdictions set forth in Schedule 2.1 of the Schedule of Exceptions. There is no
other jurisdiction in which the business the Company is conducting, or the operation,
ownership or leasing of their respective properties, requires the Company to be
qualified to do business as a foreign corporation, except where the failure to be so
qualified has not resulted in, and is not reasonably be expected to result in, either
individually or in the aggregate, a material adverse effect on the business, results of
operations, assets, liabilities (absolute, accrued or contingent), or condition (financial
or otherwise) of the Company other than as a result of (i) the announcement or
pendancy of the transactions contemplated by this Agreement; (ii) changed generally
adversely affecting the United States economy; and (iii) changes in business practices
or policies put into place by the Purchaser after the Closing (a "Company Adverse
Effect").

(b)    The Company only maintains one office at 9633 S. 48th Street,
Suite #100, Phoenix, AZ 85044.

## 2.2    Authority and Enforceability; Good Title

(a)    The Company has all requisite power and authority to execute
and deliver this Agreement and to perform its obligations hereunder. The execution
and delivery of this Agreement and the consummation of the transactions
contemplated hereby, included but not limited to the Merger, have been duly
authorized by all necessary corporate and shareholder action on the part of the
Company. This Agreement has been duly executed and delivered by the Company
and constitutes a legal, valid and binding obligation of the Company, enforceable
against the Company in accordance with its terms, except (i) as enforcement may be
limited by bankruptcy, insolvency or other similar laws and equitable principles
relating to or affecting the rights of creditors generally from time to time in effect, (ii)
as the availability of indemnification and other remedies may be limited by federal and
state securities laws and (iii) for limitations imposed by general principles of equity.

-6-

(b)     Each Shareholder is legally competent and has all requisite power·
and authority to enter into this Agreement and each of the agreements, certificates,
instruments and documents executed or delivered (or required to be executed and
delivered, as a condition to the Closing or otherwise) pursuant to the terms of this
Agreement by such Shareholder (collectively, the "Related Documents"), including,
without limitation, (i) Confidentiality and Non-Circumvention agreements and (ii) the
Security Agreement to be entered into as of the Closing between PPDA and the
Shareholders and to perform fully such Shareholder's obligations hereunder and
thereunder. This Agreement has been, and each Related Document to which each
Shareholder is a party has been or will be at or prior to the Closing, duly executed and
delivered by such Shareholder. This Agreement is, and each other Related Document
will be upon execution and delivery thereof by a Shareholder, a legal, valid and
binding obligation of such Shareholder, enforceable against such Shareholder in
accordance with its terms, except (i) as enforcement may be limited by bankruptcy,
insolvency or other similar laws and equitable principles relating to or affecting the
rights of creditors generally from time to time in effect, (ii) as the availability of
indemnification and other remedies may be limited by federal and state securities laws
and (iii) for limitations imposed by general principles of equity.

(c)     Each Shareholder owns beneficially and of record the Shares set
forth opposite such Shareholder's name on Exhibit A hereto, free and clear of any
lien, encumbrance, preemptive right, right of first offer or refusal, or other prior claim,
and delivery by such Shareholder to the Purchaser of the certificates representing the
Shares at the Closing will transfer to the Purchaser good and valid title to the Shares
and the Purchaser will acquire record and beneficial ownership of the Shares, free and
clear of any lien, encumbrance, preemptive right, right of first offer or refusal, or other
prior claim.

## 2.3   Consents and Approvals

The execution, delivery and performance of this Agreement and the Related
Documents by the Company and the Shareholders (as applicable), and the
consummation by the Company and the Shareholders of the transactions contemplated
hereby and thereby, will not (a) constitute a violation (with or without the giving of
notice or lapse of time or both) of any provision of any statute, law, ordinance, rule,
regulation or administrative ruling or any governmental permit, franchise or license or
any injunction, judgment, order or consent or similar decree or agreement, whether
federal, state, local or foreign (any of the foregoing being referred to herein as a
"Law") applicable to the Company or any Shareholder, except such violations as
would not result in a Company Adverse Effect and would not have a material adverse
effect on the ability of any Shareholder to consummate the transactions contemplated

- 7 -

hereby, (b) require any consent, approval or authorization of, or the making of any declaration, filing, registration, qualification or recording with, any individual, corporation, partnership, association, trust, joint venture, unincorporated organization or other entity or any federal, state, provincial, local, county or municipal government, governmental, regulatory or administrative agency, department, commission, board, bureau or other authority or instrumentality, domestic or foreign ("Governmental Entity" or "Person") by or on behalf of the Company or any Shareholder, except for compliance with the applicable securities laws and the filing of all documents necessary to consummate the Merger with the North Dakota Secretary of State, and the Delaware Secretary of State, as the case may be, other than those that have been made or will be timely made, and except such violations as would not result in a Company Adverse Effect and would not have a material adverse effect on the ability of any Shareholder to consummate the transactions contemplated hereby, (c) result in a breach, violation or default under, an acceleration or termination of, or any other cause of action under, or create in any party a right to accelerate, terminate, modify or cancel ("Breach"), any agreement, lease, note, instrument, contract, arrangement or other restriction, encumbrance, obligation or liability to which the Company or any Shareholder is a party or by which the Company or any Shareholder is bound or to which any of their assets or rights are subject, except as set forth in Schedule 2.3(c) of the Schedule of Exceptions and except such Breaches as shall not cause a Company Adverse Effect, (d) result in the creation of any Encumbrance (as defined in Section 2.8(b)) upon, or forfeiture of, any of the Company's assets or rights, except such Breaches as shall not cause a Company Adverse Effect, (e) conflict with or result in a breach of or constitute a default under any provision of the charter documents or bylaws of the Company, except such Breaches as shall not cause a Company Adverse Effect, (f) invalidate or adversely affect any permit, license or authorization used in the conduct of the business of the Company, or (g) except as set forth on Schedule 2.3(g), require any severance payments, stay bonuses or other special compensation to be made by the Company.

## 2.4    Capitalization

The authorized capital stock of the Company consists solely of 100,000 shares of common stock, US$1.00 par value per share ("Company Common Stock"), of which 15,000 shares are issued and outstanding. Such issued and outstanding shares of Company Common Stock constitute the Shares. All such issued and outstanding shares of Company Common Stock have been duly authorized and validly issued, are fully paid and nonassessable, were not issued in violation of and are not subject to any preemptive or other similar rights, and are held beneficially and of record by the Shareholders. There are no outstanding or authorized subscriptions, options, warrants, calls, rights (including preemptive or similar rights), convertible or exchangeable

- 8 -

securities or commitments or other agreements of any character which obligate or may obligate the Company to issue any additional shares of capital stock or any securities convertible into, exercisable for, exchangeable for or otherwise evidencing the right to acquire any shares of capital stock of the Company. There is no agreement or charter or bylaw provision which obligates or may obligate the Company to purchase or redeem any securities or options, warrants or other rights to acquire securities of the Company. The Company has provided the Purchaser with true and complete copies of all certificates or other documents or instruments evidencing or representing the Shares. Immediately prior to the Closing, (i) the Company will have no outstanding equity securities other than the Shares and (ii) the Company shall have no obligation to pay any dividends or other Distributions (as defined in Section 2.7(i)). There are no shareholders' agreements, voting agreements, voting trusts or other agreements or understandings to which the Company or any Shareholder is a party or by which the Company or any Shareholder is bound relating to the voting of, giving of written consents with respect to, or the placing of any restrictions on, any shares of capital stock of the Company. None of the Shares is subject to any right of first refusal, right of first offer, co-sale right, other restriction on transfer or other agreement or obligation of any kind with respect to any sale, transfer or other disposition of such Shares. The Shares were issued in compliance with all applicable federal, state and other laws.

## 2.5    Financial Statements

The Company has delivered to PPDA balance sheets and statements of operations, retained earnings and cash flows of the Company (collectively, the "Financial Statements") as of and for the fiscal years ended December 31, 2004 and 2005 and for the quarter ended March 31, 2006. The Company has no Knowledge of, and has not been advised by any independent accounting firm of any material weaknesses or reportable conditions in its accounting or internal control systems. The Financial Statements of the Company have been prepared in accordance with United States generally accepted accounting principles ("GAAP") applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto), and fairly present the financial position, results of operations and changes in cash flows of the Company as of the dates and for the periods indicated, subject to normal, recurring, period-end adjustments which will not be material individually or in the aggregate.

## 2.6    Undisclosed Liabilities

(a)    The Company has no liabilities or obligations of any kind (absolute, accrued, contingent or otherwise) which would be required to be reflected

or reserved against under GAAP and which are not reflected or reserved against in the balance sheet of the Company dated December 31, 2005, except liabilities and obligations which are not material either individually (which the parties agree shall mean, for the purpose of this Section 2.6 only, US$10,000) or in the aggregate (which the parties agree shall mean, for the purpose of this Section 2.6 only, US$25,000) or were incurred since December 31, 2005 in the ordinary course of business or as a result of the Residual Repurchases. As of December 31, 2005, the Company had, and as of the Closing the Company will have, no Debt (as defined below) except as a result of the Residual Repurchases.

## 2.7    Absence of Certain Changes or Events

Except as set forth in Schedule 2.7 of the Schedule of Exceptions, the Company has not since March 31, 2006, directly or indirectly:

(a)    taken any action or entered into or agreed to enter into any transaction, agreement or commitment (other than this Agreement and the Related Documents) other than in the ordinary course of business, consistent with past practice;

(b)    sold, leased or licensed to others or otherwise disposed of any material amount of assets or rights (except for sales of inventory in the ordinary course of business);

(c)    entered into any contract, agreement or other binding obligation, other than this Agreement and the Related Documents, relating to (i) the purchase of any equity securities or options, warrants or other rights to acquire equity securities of any Person, (ii) the purchase of assets either material in amount or constituting a business, or (iii) any merger, consolidation or other business combination;

(d)    canceled or compromised any Debt or other material obligation owing to the Company or any claim in excess of US$10,000 individually or US$25,000 in the aggregate, waived or released any right in excess of US$10,000 individually or US$25,000 in the aggregate, or instituted, settled or agreed to settle any actual or threatened litigation, arbitration, legal proceeding, investigation or similar dispute (provided that such dollar limitations set forth in this paragraph (d) shall not apply with respect to any matter involving an affiliate or employee of the Company);

(e)    granted, other than in the ordinary course of business and consistent with past practice, any increase in the compensation of directors, officers, employees or consultants (including any such increase pursuant to any employment

- 10 -

agreement or bonus, pension, profit-sharing, lease payment or other plan or commitment) or any increase in the compensation payable or to become payable to any director, officer, employee or consultant, or experienced any actual or threatened employee strikes, work stoppages, slow-downs or other significant or potentially significant employee relations issues;

(f)    disposed of or permitted to lapse any rights to the use of any Technology or IP Rights (as defined in Section 2.14), or disclosed to any Person or entity without obtaining an appropriate confidentiality agreement or other appropriate protections any proprietary information not theretofore a matter of public knowledge, or entered into or agreed to any sale, assignment, transfer or license of any Technology or IP Rights or any amendment or change to any existing license or other agreement relating to Technology or IP Rights, other than in the ordinary course of business;

(g)    (i) made any material change in any method of accounting or accounting practice or internal control procedure or, other than in the ordinary course of business, in its pricing, billing, payment, collection or credit policies or practices, (ii) granted any extensions of credit other than in the ordinary course of business, or (iii) failed to pay any creditor any amount owed to such creditor when due other than in the ordinary course of business in connection with bona fide claims or disputes;

(h)    made any gifts of or sold, leased, transferred or exchanged any material property or rights for less than the fair value thereof;

(i)    (i) made, declared or paid any dividend or other distribution on or in respect of any equity security of the Company; (ii) purchased, redeemed or otherwise retired any equity security of the Company; (iii) made any payment or other distribution on or in respect of the principal of, interest on, or otherwise relating to, directly or indirectly, any Debt owing to any affiliate (as such term is defined in Section 2.17 hereof); or (iv) otherwise permitted or suffered the withdrawal by any Shareholder of cash or other assets (real, personal or mixed, tangible or intangible), in compensation, indebtedness or otherwise, other than payments of compensation or dividends in the ordinary course of business and consistent with past practice (any of the foregoing matters referred to in this subsection (i) being a "Distribution");

(j)    incurred or otherwise become liable in respect of any Debt;

(k)    experienced any material adverse change in its relationships with employees, agents, processors, issuers, merchants, customers, distributors, or suppliers;

- 11 -

(l)     acquired any corporation, partnership, other business organization or division thereof;

(m)     entered into any transactions otherwise than on an arm's-length basis;

(n)     entered into or performed any transaction with any affiliate of the Company as such term is defined in Section 2.17 hereof;

(o)     issued any equity securities or options, warrants, convertible or exchangeable securities or other rights to acquire equity securities of the Company;

(p)     made any single capital expenditure or commitment in excess of US$10,000 for additions to property, plant, equipment or intangible capital assets or made aggregate capital expenditures in excess of US$25,000 for additions to property, equipment or intangible capital assets;

(q)     entered into any contract, agreement or other binding obligation to do any of the things referred to in clauses (a) through (p) above; or

(r)     experienced any event or series of events which has had or could reasonably be expected to have, individually or in the aggregate, a Company Adverse Effect.

For purposes of this Agreement:

(1)     The term "Debt" shall mean, with respect to any Person, all obligations of such Person (i) for borrowed money, (ii) evidenced by notes, bonds, debentures or similar instruments, (iii) under or relating to letters of credit (including, without limitation, any obligation to reimburse the letter of credit issuer with respect to amounts drawn under such instruments), (iv) for the deferred purchase price of goods or services (other than trade payables or accruals incurred and paid in the ordinary course of business, but only to the extent that such payables or accruals are not interest-bearing), (v) under capital leases, (vi) with respect to check overdrafts, cash/book overdrafts or otherwise reflected as negative cash in financial statements of such Person, (vii) for deferred compensation, (viii) to pay any accrued dividends, (ix) constituting a stated amount or liquidation preference amount of any equity security entitled to any preference over the Company Common Stock, and (x) in the nature of Guarantees (as defined below) of the obligations described in clauses (i) through (ix) above of any other Person; and

(2)    The term "Guarantee" shall mean the guarantee of any monetary obligation, including, without limitation, (A) any guarantee of the payment or performance of, or any contingent obligation in respect of, any Debt or other obligation of any other Person, (B) any other arrangement whereby credit is extended to one obligor on the basis of any promise or undertaking of another Person (i) to pay the Debt of such obligor, (ii) to purchase any obligation owed by such obligor, (iii) to purchase or lease assets (other than inventory in the ordinary course of business) under circumstances that would enable such obligor to discharge one or more of its obligations, or (iv) to maintain the capital, working capital, solvency or general financial condition of such obligor, and (C) any liability as a general partner of a partnership or as a venture in a joint venture in respect of Debt or other obligations of such partnership or venture.

### 2.8    Property

(a)    Schedule 2.8(a) of the Schedule of Exceptions contains a complete and accurate list of all items of personal property with an individual value in excess of US$10,000 (excluding for this purpose the Technology and IP Rights, as defined in Section 2.14) (the "Personal Property") owned, leased or used by the Company. The Company owns no real property. The Company has delivered to the Purchaser true and complete copies of all deeds, leases, subleases, rental agreements, notices, memoranda or short forms of leases and related tenant estoppel certificates, subordination agreements, nondisturbance agreements, contracts of sale, tenancies, easements, licenses, certificates of title or other evidence of the Company's rights in and to all or any portion of the Personal Property, all of which are listed in Schedule 2.8(a) of the Schedule of Exceptions.

(b)    The Company has good and marketable title to, or, in the case of property held under lease or other contractual obligation, a valid and enforceable right to use under an enforceable lease or license, all of its properties, rights and assets, whether real or personal and whether tangible or intangible (including the Personal Property, but excluding Intellectual Property) used or useful in the conduct of the business of the Company as currently conducted, including, without limitation, all properties, rights and assets reflected in the balance sheet of the Company dated December 31, 2005 included in the Financial Statements (except as sold or otherwise disposed of since such date in the ordinary course of business), free and clear of any and all liens, encumbrances, security interests, pledges, adverse claims, restrictions, covenants, leases, remainders or other adverse interests of any kind, other than liens that do not detract from the value of property subject thereto or impair the operations of the Company ("Encumbrances").

(c)     Each lease, license, rental agreement, contract of sale or other agreement to which the Personal Property is subject, is valid and in full force and effect, the Company has complied in all material respects with its obligations thereunder, and neither the Company nor, to the actual knowledge of Dan Erickson, Jason Kujanson and Sean Kramer (the "Knowledge of the Company" or "the Company's Knowledge"), any other party thereto is in default thereunder in any material respect, nor is there any event which, with the giving of notice or lapse of time or both, would constitute a material default thereunder by the Company or, to the Knowledge of the Company, any other party thereto.

(d)     All Personal Property is in good working order, operating condition and state of repair, ordinary wear and tear excepted.

## 2.9    Compliance With Laws

The Company has at all times complied and is currently in compliance with all Laws applicable to the Company, its business and the properties owned, leased or used by the Company, including, without limitation, all Laws relating to intellectual property protection, antitrust matters, environmental protection, equal employment opportunity, pension and employee benefit matters, securities and investor protection matters and labor and employment matters, except to the extent such noncompliance has not had, and is not reasonably expected to have, individually or in the aggregate, a Company Adverse Effect. The Company has not received notification of any unasserted present or past unremedied material failure to comply with any Laws. The manner in which the Company has advertised and sold its product complies in all material respects with all applicable Laws pertaining thereto.

## 2.10   Material Contracts

Schedule 2.10 of the Schedule of Exceptions contains a complete and accurate list of all of the following contracts, agreements, instruments and arrangements to which the Company is a party (a true and complete copy of each of which has been delivered by the Company to the Purchaser) (the "Material Contracts"):

(a)     All collective bargaining agreements and other labor agreements; all employment, consulting, independent contractor and work made for hire agreements, all Plans (as defined in Section 2.13(a)) and all other plans, agreements, arrangements or practices which constitute or specify compensation or benefits to any of the directors, officers, employees, consultants or independent contractors of the Company;

- 14 -

(b)     All contracts, agreements and similar obligations under which the Company is or may become obligated to pay any legal, accounting, brokerage, finder's or similar fees or expenses in connection with, or to incur any severance pay or special compensation obligations which would become payable by reason of, this Agreement or the consummation of the transactions contemplated hereby;

(c)     All contracts, agreements and similar obligations under which the Company is or will after the Closing be (i) restricted from carrying on any business or other activities anywhere in the world or (ii) bound to participate in any allocation or sharing of Taxes (as defined in Section 2.12);

(d)     All contracts, agreements and similar obligations (including, without limitation, options) to (i) sell or otherwise dispose of any assets or rights of the Company except in the ordinary course of business or (ii) purchase or otherwise acquire any material assets or rights except in the ordinary course of business;

(e)     All contracts, agreements and similar obligations under which the Company has or will after the Closing have any liability or obligation to or for the benefit of any Affiliate (as defined in Section 2.17 hereof) of the Company;

(f)     All contracts, agreements and similar obligations under which the Company has any liability or obligation for Debt or constituting or giving rise to a Guarantee of any liability or obligation of any Person, or under which any Person has any liability or obligation constituting or giving rise to a Guarantee of any liability or obligation of the Company (including, without limitation, partnership and joint venture agreements);

(g)     All contracts, agreements and similar obligations under which the Company may become obligated to pay any amount in excess of US$10,000 in respect of indemnification obligations, purchase price adjustment or otherwise in connection with any (i) acquisition or disposition of assets other than sales of inventory in the ordinary course of business, (ii) acquisition or disposition of securities, (iii) assumption of liabilities or warranty, (iv) settlement of claims, (v) merger, consolidation or other business combination, or (vi) any series or group of related transactions or events of a type specified in subclauses (i) through (v);

(h)     All license agreements, royalty agreements, software development agreements, joint venture agreements, distribution agreements, reseller agreements, supply agreements, manufacturing agreements, other agreements relating to Technology or IP Rights or pursuant to which the Company has granted rights or permission to use Technology or IP Rights of the Company, and similar commercial arrangements;

- 15 -

(i)    All contracts with Governmental Entities;

(j)    Each other contract, agreement, instrument, arrangement, commitment or obligation the unremedied breach of which is reasonably expected to have a Company Adverse Effect;

(k)    All contracts with merchants, processors, suppliers, card companies.

Except as described on Schedule 2.10, all such Material Contracts are valid, binding and in full force and effect, the Company and, to the Company's Knowledge, each other party thereto have performed in all material respects their obligations thereunder, and neither the Company nor, to the Company's Knowledge, any other party thereto is in default of any material provision thereunder, nor has there occurred any event or circumstance which with notice or lapse of time or both would constitute - such a default or event of default, on the part of the Company or, to the Company's Knowledge, any other party thereto or give to any other party thereto the right to terminate or modify in any material respect any such Material Contract. The Company has not received written notice that any party to any such Material Contract intends to cancel, terminate or refuse to renew such contract or to exercise or decline to exercise any option or right thereunder.

Except as provided in this Agreement, there is no contract, agreement or other arrangement entitling any person or other entity to any profits, revenues or cash flows of Company or requiring any payments of other distributions based on such profits, revenues or cash flows.

## 2.11  Claims and Legal Proceedings

There are no filed claims, actions, suits, arbitrations, proceedings or, to the Company's Knowledge, unfiled claims or investigations ("Actions") pending or, to the Company's Knowledge, threatened against the Company or any Shareholder before or by any Governmental Entity or any nongovernmental department, commission, board, bureau, agency or instrumentality or any other body. There is no Action pending or, to the knowledge of the Company, threatened against the Company or any Shareholder which seeks rescission of, seeks to enjoin the consummation of, or otherwise relates to, this Agreement or any of the transactions contemplated hereby. There are no outstanding or unsatisfied judgments, orders, decrees, stipulations or settlements to which the Company or any Shareholder is a party or by which the Company or any Shareholder is otherwise bound which imposes any material obligation on the Company. To the Knowledge of the Company, no event has occurred and no circumstance, matter or set of facts exists which would constitute a

- 16 -

valid basis for the assertion by any third party of any claim or Action against any party which could reasonably be expected to have a Company Adverse Effect. There is no outstanding or, to the Knowledge of the Company, threatened judgment, injunction, order or consent or similar decree or agreement of any Governmental Entity against or naming the Company or any Shareholder or naming any of their respective properties, rights or assets that materially affects the Company or its assets or operations. There are no Actions which have been settled or resolved by litigation or arbitration within the last three years.

## 2.12  Taxes

(a)    (i) All Tax Returns (as defined below) required to be filed by or on behalf of the Company have been or will be filed on a timely basis with the appropriate Governmental Entities in all jurisdictions in which such Tax Returns are required to be filed, and all such Tax Returns were true, correct and complete in all material respects; (ii) all Taxes (as defined below) of the Company (whether or not reflected on any Tax Return) have been fully and timely paid; (iii) no waivers of statutes of limitation have been given or requested with respect to the Company in connection with any Tax Returns covering the Company with respect to any Taxes payable by it; and (iv) the Company has duly and timely withheld from employee salaries, wages and other compensation and paid over to the appropriate Governmental Entities all amounts required to be so withheld and paid over for all periods under all applicable laws. There are no tax liens on any of the Company's property or assets other than liens for current property taxes not yet payable.

(b)    All deficiencies asserted or assessments made as a result of any examinations by the Internal Revenue Service (the "IRS") or any other Governmental Entity of the federal, foreign, state and local Tax Returns of or covering the Company have been fully paid, and there are no other unpaid deficiencies asserted or assessments made by any Governmental Entity against the Company, there are no audits or investigations by any Governmental Entity in progress (of which the Company has received notice) or, to the knowledge of the Company, pending.

(c)    Neither the Company nor any other Person on behalf of the Company: (i) has filed a consent pursuant to Section 341(f) of the Code or agreed to have Section 341(f)(2) of the Code apply to any disposition of a subsection (f) asset (as such term is defined in Section 341(f)(4) of the Code) owned by the Company; (ii) has executed or entered into a closing agreement pursuant to Section 7121 of the Code or any predecessor provision thereof or any similar provision of state, local or foreign law; or (iii) has agreed to or is required to make any adjustments pursuant to Section 481(a) of the Code (and has filed a Form 3115) or any similar provision of

- 17 -

state, local or foreign law by reason of a change in accounting method initiated by the Company or has notice that a Governmental Entity has proposed any such adjustment or change in accounting method.

(d)    The Company has made available to PPDA complete and correct copies of all Tax Returns of the Company, except for Tax Returns (i) for which the statutes of limitation have expired or (ii) not yet due. No claim has been made by a Governmental Entity in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction. The Company is currently not the beneficiary of any extension of time within which to file any Tax Return.

(e)    The Company has not made any payments, is not obligated to make any payments, and is not a party to any agreement that under certain circumstances could obligate it to make any payments that will not be deductible under Section 280G of the Code (or any similar provision of state, local or foreign law).

(f)    The Company has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(2)(i) of the Code.

(g)    The Company is not a party to any Tax allocation or sharing agreement. The Company (i) has not been a member of an affiliated group filing a consolidated income Tax Return under Section 1501 of the Code (or any similar provision of state, local or foreign law) and (ii) does not have any liability for Taxes of any Person under Treasury Regulations § 1.1502-6 (or any similar provision of state, local or foreign law) as a transferee or successor by contract or otherwise.

(h)    The unpaid taxes of the Company (i) did not, as of December 31, 2005, exceed the reserve for tax liability set forth on the face (rather than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) of the consolidated balance sheet of the Company dated December 31, 2005 and (ii) do not exceed that reserve as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Company in filing Tax Returns.

(i)    All transactions between the Company and the Shareholders have, for Tax purposes, been at arm's-length and commercially reasonable.

As used in this Agreement, the following terms shall have the following meanings:

- 18 -

"Taxes" means all foreign, federal, state, county or local taxes, charges, fees, levies, imposts, duties, and other assessments, including, but not limited to, any income, alternative minimum or add-on tax, estimated, gross income, gross receipts, sales, use, transfer, transactions, intangibles, ad valorem, value-added, franchise, registration, title, license, capital, paid-up capital, profits, withholding, payroll, employment, excise, severance, stamp, occupation, premium, real property, recording, personal property, federal highway use, commercial rent, environmental (including, but not limited to, taxes under Section 59(a) of the Code) or the windfall profit tax, custom, duty or other tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest, penalties or additions to tax.

"Tax Returns" means any return, declaration, report, claim or refund, information return, statement, or other similar document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

## 2.13   Employee Benefit Plans

(a)     Identification. The Company has maintained one employee benefit plan, program, policy, commitment or other arrangements (whether or not set forth in a written document), including, but not limited to, any arrangement that would be an "employee benefit plan," within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"): a 419 plan for the benefit of Dan Erickson, Jason Kujanson and Sean Kramer ("Plan" or "Plans"). With respect to each Plan, the Company has furnished to PPDA a copy of each Plan (and all amendments thereto) and copies of all related Plan documents (including, but not limited to, any trust agreements, insurance policies and contracts, administrative or investment services agreements and summary plan descriptions) and, where applicable, the most recent IRS determination letter issued with respect to such Plan, and the Forms 5500 filed with respect to such Plan for the last three Plan years. The Company intends to transfer the Plan to an affiliate company prior to the Closing in connection with a planned restructure described in Section 9.16.

(b)     Legal Compliance. Each Plan has been maintained, operated and administered in all material respects in compliance with its terms and with the requirements prescribed by any and all applicable laws, statutes, orders, rules and regulations, including but not limited to, ERISA, COBRA, the Code and any similar foreign laws. Nothing has occurred, or is expected by the Company or any of its officers to occur, that has subjected or is likely to subject the Company or any officer or director of the Company to any tax, penalty or other liability or expense under Chapter 43 of Subtitle D of Chapter 1 of the Code, Title I of ERISA, or any similar foreign law, except for any such taxes, penalties, liabilities or expenses as are not

- 19 -

material either individually or in the aggregate. None of the Company or any corporation, trade or business with which the Company is treated as a single employer under Section 414(b), (c), (m) or (o) of the Code or any similar foreign law applicable thereto maintains or contributes to, or has ever maintained or contributed to (or been obligated to contribute to), any employee benefit plan that is covered by Section 302 or Title IV of ERISA, Section 412 of the Code or any similar foreign law or that is a multiemployer plan, within the meaning of Section 3(37) or 4001(a)(3) of ERISA or any similar foreign law. None of the Company or any Plan has any obligation to provide or contribute toward the cost of any health or other welfare benefits, within the meaning of Section 3(1) of ERISA, with respect to any current, former or retired employee after such current, former or retired employee's retirement or other termination of employment, except for such benefits that are mandated by Section 4980B(f) of the Code or Part 6 of Subtitle B of Title I of ERISA and except for any such obligations as could not give rise to any liabilities or expenses to the Company or the Plans that are material either individually or in the aggregate. The Company has no (nor is likely to have) any actual or potential liability with respect to any employee benefit plans, programs, policies, commitments or arrangements maintained by or on behalf of any other person or entity, except for liabilities that are not material either individually or in the aggregate. No claim, suit, administrative proceeding, action or other litigation (excluding claims for benefits incurred in the ordinary course of Plan activities) has been brought or, to the best knowledge of the Company and each of its officers, is contemplated or threatened, against or with respect to any such Plan, including, but not limited to, any audit, investigation or inquiry by the IRS, United States Department of Labor or any similar foreign governmental authority.

(c)     Contributions and Costs. All contributions, reserves or premium payments required to have been made or accrued as of the date hereof to the Plans have been timely and properly made or accrued, as applicable. Nothing has occurred since December 31, 2005 that would increase the expense of maintaining the Plans above the level of expense incurred with respect thereto for such fiscal year, except for any increases that are not material either individually or in the aggregate. The Company can terminate each Plan at any time and for any reason without material cost or liability to the Company.

(d)     Consequences of Transaction. Except as set forth on Schedule 2.13 of the Schedule of Exceptions, neither the execution or delivery of this Agreement or any related agreement by the Company, nor the consummation of any transaction contemplated by this Agreement or any related agreement, will result in any (i) payment (whether of severance pay or otherwise) becoming due from the Company to any current, former or retired officer, employee, director, agent or

- 20 -

independent contractor thereof or to the trustee under any "rabbi trust" or similar arrangement or (ii) benefit under any Plan being established or becoming accelerated, vested or payable, except for any such payments or benefits as are not material either individually or in the aggregate.

## 2.14   Intellectual Property

(a)    Company Technology.  The Company owns no proprietary intellectual property ("IP Rights") and only licenses third party owned intellectual property of the type purchasable off the shelf from third party licensors.

(b)    Third Party Infringement.  To the Company's Knowledge there has been no infringement on the intellectual property rights of a third party by it nor has it received any notice or claim (whether written, oral or otherwise) challenging the Company's use of any intellectual property.

## 2.15   Labor and Employment Matters

There are no labor disputes, material employee grievances or disciplinary actions pending or, to the Company's Knowledge, threatened against or involving the Company or any of its present or former employees.  The Company has complied in all material respects with all provisions of Law relating to employment and employment practices, terms and conditions of employment, wages and hours and similar matters, including, without limitation, classification of personnel as employees or independent contractors, except for such non-compliance and practice which does not have, and in the future is not reasonably likely to have, a Company Adverse Effect.  The Company is not engaged in any unfair labor practice and has no liability in excess of US$10,000 in the aggregate for any arrears of wages or Taxes or penalties for failure to comply with any such provisions of Law.  There is no labor strike, dispute, slowdown or stoppage pending or, to the Company's Knowledge, threatened against or affecting the Company, and the Company has not experienced any work stoppage or other material labor difficulty since its incorporation.  No collective bargaining agreement is binding on the Company.  The Company has no Knowledge of any organizational efforts presently being made or threatened by or on behalf of any labor union with respect to employees of the Company, and the Company has not been requested by any group of employees or others to enter into any collective bargaining agreement or other agreement with any labor union or other employee organization. The Company has no employment, noncompete, inventions assignment or other contract relating to the relationship of the Company to its employees.  The Company has no obligation or liability for severance or back pay owed through or by virtue of the Closing.  The Company is not a party to any employment agreement or other

- 21 -

agreement relating to the provision of executive or management services. The Company has provided to the Purchaser a true and complete list of all employees, consultants and independent contractors of the Company who are individuals or are wholly owned by an individual and the total compensation (cash and otherwise) paid to each by the Company for fiscal 2005.

## 2.16    Insurance

The Company does not maintain any commercial general liability insurance.

## 2.17    Related Party Transactions

No Shareholder, officer, director or Affiliate (as defined below) of the Company ("Related Party") has any interest (other than as a Shareholder of the Company) (a) in any property, real or personal, tangible or intangible, used in or directly pertaining to the Company's business, or (b) in any agreement, contract, arrangement or obligation relating to the Company or its present or prospective business or operations. Except as set forth in this Agreement or in the Schedule of Exceptions, there are no agreements, understandings or proposed transactions between the Company and any Related Party. Neither the Company nor any Related Party has any interest, either directly or indirectly, in any entity, including, without limitation, any corporation, limited liability company, partnership, joint venture, proprietorship, firm, licensee, business or association (whether as an employee, officer, director, shareholder, agent, independent contractor, security holder, creditor, consultant or otherwise) that (a) provides any services, produces and/or sells any products or product lines, or engages in any activity which is the same, similar to or competitive with any activity or business in which the Company is now engaged or proposes to engage; (b) is a licensor, licensee, reseller, distributor, supplier, creditor or other third party contractor of the Company; or (c) has any direct or indirect interest in any asset or property, real or personal, tangible or intangible, of the Company or any property, real or personal, tangible or intangible, that is necessary or desirable for the present or anticipated future conduct of the Company's business. As used in this Agreement, the term "Affiliate" when used with reference to any person or entity (the "Subject") means any person or entity controlling, controlled by or under common control with the Subject and does not include the Company's "affiliate network" of Internet users who refer merchants to the Company on an at will basis in exchange for payment.

## 2.18₀   Financial Advisors

No Person or entity has acted directly or indirectly as a broker, finder or financial advisor for or to the Company or any Shareholder in connection with the negotiations relating to or the transactions contemplated by this Agreement, and no

- 22 -

Person or entity is entitled to any fee or commission or like payment, or expense reimbursement, as a broker, finder or financial advisor in respect of this Agreement or any of the transactions contemplated hereby, based in any way on agreements, arrangements or understandings made by or on behalf of the Company or any Shareholder. The Company will not have any liability to any other party for any topping fee, breakup or termination fee or similar fee or other payment or obligation resulting from the execution and delivery of this Agreement or from the consummation of the transactions contemplated hereby.

## 2.19   Corporate Books and Records

The Company has furnished to Purchaser or its representatives for their examination true and complete copies of (a) the charter or formation documents of the Company as currently in effect, including all amendments thereto, (b) the minute books of the Company. Such minutes reflect all shareholder meetings, Board of Directors meetings and meetings of all committees of the Board of Directors of the Company and such minutes accurately reflect the events of and actions taken at such meetings. Such stock transfer books accurately reflect all issuances and transfers of shares of capital stock of the Company since inception.

## 2.20   Permits

The Company has received all currently required approvals, authorizations, consents, licenses, orders, registrations and permits of all Governmental Entities, except as have not had, and could not reasonably be expected to have, a Company Adverse Effect. The Company has not received any written notifications of any asserted present failure by it to have obtained any such approval, authorization, consent, license, order, registration or permit, or past and unremedied failure to obtain such items.

## 2.21   Absence of Questionable Payments

Neither the Company nor any shareholder, director, officer, employee or, to the Company's Knowledge, agent or other Person or entity acting on behalf of the Company has used any Company funds for improper or unlawful contributions, payments, gifts or entertainment, or made any improper or unlawful expenditures relating to political activity to domestic or foreign government officials or others. Neither the Company nor any current shareholder, director, officer, employee or, to the Company's Knowledge, agent or other Person or entity acting on behalf of the Company has accepted or received any improper or unlawful contributions, payments, gifts or expenditures. To the Knowledge of the Company, it has at all times complied, and is in compliance, in all respects with the Foreign Corrupt Practices Act and Laws

- 23 -

addressing similar issues and all foreign Laws relating to prevention of corrupt practices and similar matters.

## 2.22   Bank Accounts

Schedule 2.22 of the Schedule of Exceptions sets forth the names and locations of all banks, trust companies, savings and loan associations and other financial institutions at which the Company maintains safe deposit boxes or accounts of any nature and the names of all Persons authorized to draw thereon, make withdrawals therefrom or have access thereto.

## 2.23   Compliance With Environmental Laws

Neither the Company nor, to the Company's Knowledge, any other Person (including, without limitation, any previous owner, lessee or sublessee) has treated, stored or disposed of any material amounts of petroleum products, hazardous waste, hazardous substances, pollutants or contaminants on any real property previously owned, leased, subleased or used by the Company in the operation of its business, in violation of any applicable foreign, federal, state or local statutes, regulations or ordinances, or common law, in each case as in existence at or prior to the Closing ("Storage-Related Activity"), other than a Storage-Related Activity that does not have a Company Adverse Effect. There have been no releases by the Company (or, to the Knowledge of the Company, by any other party) of any material amounts of petroleum, petroleum products, hazardous waste, hazardous substances, pollutants or contaminants on, at or from any assets or properties, including, without limitation, any real property, owned, leased, subleased or used by the Company in the operation of its business during the time such assets or properties were owned, leased, subleased or used by the Company (or, to the Company's Knowledge, prior to such time), including, without limitation, any releases by the Company (or, to the Knowledge of the Company, by any other party) of any material amounts of petroleum, petroleum products, hazardous waste, hazardous substances, pollutants or contaminants in violation of any Law ("Release"), other than a Release that does not have a Company Adverse Effect.

## 2.24   Customers and Suppliers

At the Closing, the Company will provide PPDA with a complete and accurate list of the customers/merchants of the Company during the fiscal year last ended showing the approximate total revenue by the Company to each such customer during the fiscal year last ended. The Company does not expect any material modification to its relationship with any such customer/merchant, which would have a Company Adverse Effect.

- 24 -

**2.25    Accounts Receivable**

All accounts receivable of the Company reflected in the balance sheets of the Company dated December 31, 2005 and March 31, 2006 represent revenue actually made in the ordinary course of business. Except as described in Schedule 2.25 of the Schedule of Exceptions, the bad debt reserves reflected in the consolidated balance sheets of the Company dated December 31, 2005 and March 31, 2006 are appropriate under generally accepted accounting principles in the relevant jurisdiction.

**2.26    Confidentiality**

Since entering into that certain Letter of Intent dated April XX, 2006 among PPDA and the Company, neither the Shareholders, the Company nor its Affiliates or representatives have distributed any confidential information regarding the Company in connection with a proposal for the sale of the Company, other than to PPDA and the advisors of the Company and the Shareholders.

**2.27    Full Disclosure**

This Agreement (including the Schedule of Exceptions and the attachments thereto) does not to the Knowledge of the Company or the Shareholders contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained herein or in the Schedule of Exceptions (and the attachments thereto), in light of the circumstances under which they were made, not misleading.

## ARTICLE III - REPRESENTATIONS AND WARRANTIES OF PPDA AND THE PURCHASER

PPDA and the Purchaser hereby jointly and severally represent and warrant to the Company and the Shareholders as follows in this Article III:

**3.1    Organization and Good Standing**

PPDA is a corporation duly organized, validly existing and in good standing under the laws of the state of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted. The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and assets and to carry on its business as now being conducted and as proposed to be conducted.

ORPHX\12576S 00003\201 1706 9

## 3.2 Authority and Enforceability

PPDA and the Purchaser have all requisite power and authority to execute and deliver this Agreement and any of the Related Documents to which PPDA or the Purchaser is a party and to perform fully their obligations hereunder and thereunder. The execution and delivery of this Agreement and any such Related Documents to which PPDA or the Purchaser is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate action on the part of the PPDA and Purchaser. This Agreement has been, and any such Related Documents to which PPDA or the Purchaser is a party will be at the Closing, duly executed and delivered by PPDA and the Purchaser, as applicable and this Agreement constitutes, and upon execution and delivery thereof at the Closing each such Related Document to which PPDA or the Purchaser is a party will constitute, a legal, valid and binding obligation of PPDA or the Purchaser, enforceable against PPDA or the Purchaser in accordance with its terms, except (i) as enforcement may be limited by bankruptcy, insolvency or other similar laws and equitable principles relating to or affecting the rights of creditors generally from time to time in effect, (ii) as the availability of indemnification and other remedies may be limited by federal and state securities laws and (iii) for limitations imposed by general principles of equity.

## 3.3 Consents and Approvals

The execution, delivery and performance of this Agreement by PPDA and the Purchaser, and the consummation by PPDA and the Purchaser of the transactions contemplated hereby, will not (a) constitute a violation (with or without the giving of notice or lapse of time or both) of any provision of any Law applicable to PPDA or the Purchaser, except such violations as would not result in a material adverse effect to PPDA or the Purchaser and would not have a material adverse effect on the ability of PPDA or the Purchaser to consummate the transactions contemplated hereby, (b) require any consent, approval or authorization of, or the making of any declaration, filing, registration, qualification or recording with, any Person by or on behalf of PPDA or the Purchaser, except for compliance with the applicable securities laws and the filing of all documents necessary to consummate the Merger with the North Dakota Secretary of State and the Delaware Secretary of State, as the case may be, or (c) conflict with or result in a breach of or constitute a default under any provision of the charter documents or bylaws of PPDA or the Purchaser or of any material agreement to which PPDA or the Purchaser is a party.

### 3.4    Capitalization

As of the date of this Agreement, PPDA's authorized capital stock consists of 95,000,000 shares of PPDA Common Stock, of which 39,687,537shares were issued and outstanding on March 31, 2006, and 5,000,000 shares of preferred stock, par value US$0.01 per share, of which no shares are issued and outstanding. All outstanding shares of PPDA Common Stock are duly authorized, validly issued, fully paid and nonassessable.

### 3.5    Full Disclosure

The reports and statements filed by PPDA with the Securities and Exchange Commission pursuant to the 1933 Act and the Securities Exchange Act of 1934, as amended (the "SEC Reports"), do not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein, in light of the circumstances under which they were made, not misleading.

### 3.6    Financial Statements

The audited consolidated financial statements of PPDA contained or incorporated in the SEC Reports comply in all material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto, were prepared in accordance with GAAP applied on the consistent basis during the periods involved (except as may be indicated in the notes thereto) and present fairly PPDA's consolidated financial condition and the results of its operations as of the relevant dates thereof and for the periods covered thereby. The unaudited consolidated interim financial statements contained or incorporated in PPDA's SEC Reports comply in all material respects with applicable accounting requirements and with the published rules and regulations of the SEC with respect thereto, were prepared on a basis consistent with prior interim periods (except as required by applicable changes in GAAP or in SEC accounting policies) and include all adjustments (consisting only of normal recurring accruals) necessary for a fair presentation of PPDA's consolidated financial condition and results of operations for such periods.

### 3.7    Absence of Undisclosed Liabilities

Except as disclosed in the SEC Reports, PPDA does not have any indebtedness, liability or obligation required by GAAP to be reflected on a balance sheet that is not reflected or reserved against in the latest balance sheet of PPDA filed with the SEC Reports other than liabilities, obligations and contingencies that (i) were incurred after the date of such balance sheet in the ordinary course of business or (ii) would not, in

ORPHX\125765 00002\2011706 9

the aggregate, have a material adverse effect on the business, results of operations, assets, liabilities (absolute, accrued, contingent or otherwise), condition, financial or other) of PPDA.

## ARTICLE IV - COVENANTS

### 4.1    Tax Matters

(a)    The Purchaser, the Company and the Shareholders shall cooperate, as and to the extent reasonably requested, in connection with the preparation and filing of Tax Returns pursuant to this Section and any audit, investigation, litigation or other Action with respect to Taxes that may be instituted after the Closing. The Purchaser, the Company and the Shareholders shall use commercially reasonable efforts to retain all books and records with respect to Tax matters pertinent to the Company relating to any Tax period beginning before the Closing Date until the expiration of the applicable statute of limitations (and, to the extent notified by the Purchaser, the Company or the Shareholders, any extensions thereof) and shall provide any such records to the other party as may be reasonably requested.

(b)    All transfer, real estate excise, documentary, sales, use, stamp, registration and other such taxes and fees (including any penalties and interest) incurred in connection with the transactions contemplated by this Agreement and which are required under applicable law to be paid by the Shareholders shall be paid by each Shareholder when due, and each such Shareholder shall, at his or her own expense, file all necessary Tax Returns and other documentation with respect to all such transfer, documentary, sales, use, stamp, registration and other Taxes and fees.

(c)    Neither PPDA or the Purchaser shall make any representation or warranty with respect to, and expressly disclaims any responsibility for, any Tax consequences to the Shareholders arising out of the structure or terms of this Agreement, or the negotiation or consummation hereof. Each of the Shareholders has consulted with his or her own tax advisor in such matters and is solely responsible for any such Tax consequences.

### 4.2    Public Announcements

PPDA and the Shareholders will make joint announcements to the public regarding this Agreement at such time as PPDA and the Shareholders holding a majority of the Shares immediately prior to the Closing shall agree. Each party will consult in advance with the other concerning the timing and content of any other announcements, press releases or public statements concerning the purchase and sale

- 28 -

of the Shares and will not make any such announcement, release or statement without
the other's consent; provided, however, that PPDA may make any public statement
concerning the purchase and sale of the Shares without the consent of the
Shareholders holding a majority of the Shares immediately prior to the Closing, after it
has used reasonable efforts to obtain the consent of the Shareholders holding a
majority of the Shares immediately prior to the Closing if, in the opinion of counsel
for PPDA, such statement or announcement is required or advisable to comply with
applicable law.

**4.3    Conduct of Business by the Company Pending the Merger**

(a)    From the date hereof until the Effective Time and except for the
potential restructure of the Company described in <u>Section 9.16</u> and the actions
described in <u>Schedule 2.7</u>, unless PPDA shall otherwise agree or as otherwise
contemplated by this Agreement and the Company  will continue to conduct its
business and will use its best efforts to maintain its business relationships in the
ordinary and usual course and will not, without PPDA's prior written consent:

(i)    enter into any transaction not in the ordinary course of its
business and consistent with past practice;

(ii)    dispose of any of its assets except in the ordinary course of
business and consistent with past practice;

(iv)    grant to any officer, employee or consultant any change in
compensation in any form, including bonuses, or any severance or termination pay or
enter into or vary the terms of any employment or consulting agreement or benefit
plan (except the transfer of the benefit plan to L60, Incorporated) with any such
person;

(v)    fail to withhold or remit with respect to all employees all
employment taxes to the extent required by applicable law;

(vi)    make any change in accounting methods or practices;

(vii)    declare, set aside or pay any cash or stock dividend or
other distribution in respect of its capital stock, or redeem or otherwise acquire any of
its capital stock;

(viii)    amend or terminate any material contract, agreement or
license to which it is a party;

-29-

(ix)    lend any amount to any Person, other than advances for travel and expenses or customer accounts receivable that are incurred in the ordinary course of business and consistent with past practice;

(x)    guarantee or act as a surety for any obligation;

(xi)    waive or release any material right or claim;

(xii)    split or combine any outstanding shares of its capital stock of any class or enter into any recapitalization affecting the number of outstanding shares of its capital stock of any class or affecting any other of its securities;

(xiii)    merge, consolidate or reorganize with, or acquire, any entity;

(xiv)    amend its Articles of Incorporation or Bylaws or amend a similar charter document;

(xv)    agree to any audit assessment by any tax authority or file any federal or state income or franchise Tax Return, unless copies of such Tax Returns have been delivered to PPDA for its review prior to filing;

(xvi)    change any insurance coverage other than with respect to renewals of existing coverage, or issue any certificates of insurance; or

(xvii)    agree to do any of the things described in the preceding Sections 4.3(a)(i) through 4.3(a)(xvii);

(b)    Prior to the Effective Time, the Company shall use its reasonable best efforts to preserve its business organization and distribution network, to keep available the services of its present officers and key employees, to preserve the good will of those having business relationships with it and to continue its existing relationships with its lenders, suppliers, merchants, customers, processors and key employees; and

(c)    The Company shall promptly notify PPDA of any change that has a Company Adverse Affect.

## 4.4    Access and Information

The Company shall afford PPDA and PPDA's accountants, counsel and other representatives full access during normal business hours upon reasonable request and advance notice throughout the period prior to the Effective Date to all of its properties,

-30-

books, contracts, commitments and records (including, but not limited to, Tax Returns), and, during such period, the Company shall furnish promptly to PPDA all information concerning its business, properties and personnel as PPDA may reasonably request; provided, however, that no investigation pursuant to this Section 4.4 shall effect any representations or warranties made herein or the conditions to the obligations of PPDA and the Purchaser to consummate the Merger. In the event the transactions contemplated hereby do not close for any reason, PPDA and the Purchaser agree to return all documents delivered by the Company and any copies thereof and to keep all information contained therein confidential and not to disclose or divulge any such information. The penultimate sentence of this Section 4.4 shall survive the expiration or termination of this Agreement.

### 4.5    Advice of Claims

From the date of this Agreement to and including the Closing Date, each of the parties hereto will promptly advise the other parties hereto in writing of the commencement or overt threat of any Actions against or affecting such party of which such party has actual knowledge.

### 4.6    Cooperation

Each party hereto will fully cooperate with the other parties, their counsel and accountants in connection with any steps required to be taken as part of its obligations under this Agreement, including, without limitation, the obtaining of the financing to fund the Closing Consideration as described in Section 1.6.1(c)(i) herein. Each party will use its best efforts to cause all conditions to this Agreement to be satisfied as promptly as possible and to obtain all consents and approvals necessary for the due and punctual performance of this Agreement and for the satisfaction of the conditions hereof. No party will undertake any course of action inconsistent with this Agreement or that would make any representations, warranties or agreements made by such party in this Agreement untrue or any conditions precedent to this Agreement unable to be satisfied at or prior to the Closing. At the Closing, each applicable party will execute the Note, the Security Agreement and the Confidentiality and Non-circumvention Agreement.

Each party agrees to immediately remit to the appropriate party, in the form received, any payments which they receive (such as payments of accounts receivable assigned prior to the Closing to L60, Incorporated) which properly belong to one of the other parties. In particular, the parties will from time to time review pre-closing receivables and post-closing receivables, and ensure that L60 or the proper party receives all amounts attributable to work performed prior to Closing and that

Surviving Corporation receives all amounts attributable to work performed after Closing. PPDA and the Surviving Corporation will use best efforts to collect such amounts, and any amount received from a particular third party shall be allocated to the oldest receivable due from that third party.

## 4.7    Further Acts

After the Closing Date, each party hereto, at the request of and without any further cost or expense to the other parties (provided such request does not require significant cost or expense), will take any further actions reasonably necessary or desirable to carry out the purposes of this Agreement, including, but not limited to, the delivery for filing of the Articles of Merger to the North Dakota Secretary of State and the Delaware Secretary of State, as the case may be, by each party hereto, and to vest in the Surviving Corporation full title to all properties, assets and rights of the Company.

## ARTICLE V - CONDITIONS PRECEDENT TO OBLIGATIONS OF THE PURCHASER AND PPDA

The obligations of PPDA and the Purchaser to perform and observe the covenants, agreements and conditions hereof to be performed and observed by them at or before the Closing shall be subject to the satisfaction of the following conditions, which may be expressly waived by PPDA:

## 5.1    Accuracy of Representations and Warranties

The representations and warranties of the Company and each Shareholder contained herein (including applicable Exhibits or Schedules of the Schedule of Exceptions) and in the other Related Documents shall have been true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing Date as though made on that date.

## 5.2    Performance of Agreements

The Company and the Shareholders shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants and conditions contained in this Agreement or any other Related Document to be performed and complied with by them at or prior to the Closing.

### 5.3    Shareholder Approval

The Shareholders shall have duly and validly approved the Merger by a vote or written consent in accordance with North Dakota law.

### 5.4    Consents to Merger

PPDA shall have received from the Company duly executed copies of all consents, approvals or authorizations of or from any Person that may be required under the terms of any contract, agreement or other instrument for or as a result of the consummation of the transactions contemplated hereby, all in form and substance reasonably satisfactory to PPDA.

### 5.5    Compliance Certificates; Resolutions

PPDA shall have received a certificate of the President of the Company, and of each Shareholder, dated the Closing Date, in form and substance satisfactory to PPDA, certifying that the conditions to the obligations of PPDA and the Purchaser have been fulfilled.  PPDA shall have received a certificate of the Secretary of the Company listing each officer of the Company authorized to execute the Agreement and Related Documents and providing signature specimens.

### 5.6    Security Agreement

Each of the  Shareholders shall have executed and delivered the Security Agreement representing the Shareholders' secured interest in the Company's residual income securing payment of the Second Installment and the Third Installment, subject to the Purchase Price Installment Adjustment.  The parties shall file attendant UCC-1 Financing Statements.

### 5.7    Confidentiality, Non-circumvention Agreements

Each of the Shareholders shall have executed and delivered his or her respective Confidentiality, Noncompetition Agreement or agreements with covenants regarding confidentiality and non-circumvention.

### 5.8    Material Adverse Change

Since the date of this Agreement and through the Closing, there shall not have occurred (i) any material adverse change (except as otherwise disclosed on the Schedule of Exceptions) in the operations of the Company; (ii) change in any

domestic or foreign laws or regulations which has a material adverse effect on the operations of the Company; or (iii) any change in any third party contractual or other business relationships of the Company which has a material adverse effect on the operations of the Company.

## 5.9 Approvals and Consents

All transfers of permits or licenses, all approvals of or notices to public agencies, federal, state, local or foreign, the granting or delivery of which is necessary for the consummation of the transactions contemplated hereby or for the continued operation of the Company, shall have been obtained, and all waiting periods specified by law shall have passed. All other consents, approvals and notices referred to in this Agreement to such public entities shall have been obtained or delivered.

## 5.10  Proceedings and Documents; Secretary's Certificate

All documents and instruments incident to the Residual Repurchases shall have been approved by PPDA's counsel. PPDA shall have received a certificate of the Secretary of the Company, in form and substance satisfactory to PPDA, as to the authenticity and effectiveness of the actions of the Board of Directors and the Shareholders of the Company authorizing the Merger and the transactions contemplated by this Agreement and the Related Documents, and such other documents as are reasonably specified by PPDA's counsel.

## 5.11  Compliance With Laws

The consummation of the transactions contemplated by this Agreement and the Related Documents shall be legally permitted by all laws and regulations to which PPDA, the Purchaser or the Company is subject.

## 5.12  Legal Proceedings

No order of any court or administrative agency shall be in effect which enjoins, restrains, conditions or prohibits consummation of this Agreement or any Related Document, and no litigation, investigation or administrative proceeding shall be pending or threatened which would enjoin, restrain, condition or prevent consummation of this Agreement or any Related Document.

- 34 -

## 5.13   Board Approval

The Board of Directors of the Company and the Shareholders have approved the transaction, this Agreement and the Related Documents and the transactions contemplated thereby and any and all other requisite approvals have been obtained.

## 5.14   Completion of Residual Repurchases.

The Residual Repurchases which are included in the Purchase Price calculation have been completed in accordance with Section 1.7 hereof.

## ARTICLE VI - CONDITIONS PRECEDENT TO OBLIGATIONS OF THE SHAREHOLDERS AND THE COMPANY

The obligations of the Shareholders and the Company to perform and observe the covenants, agreements and conditions hereof to be performed and observed by them at or before the Closing shall be subject to the satisfaction of the following conditions, which may be expressly waived by the Company and the Shareholders.

## 6.1   Accuracy of Representations and Warranties

The representations and warranties of PPDA and the Purchaser contained herein and in the other Related Documents shall have been true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing Date as though made on that date.

## 6.2   Performance of Agreements

PPDA and the Purchaser shall have performed in all material respects all obligations and agreements and complied in all material respects with all covenants and conditions contained in this Agreement or any other Related Document to be performed and complied with by them at or prior to the Closing.

## 6.3   Compliance Certificate

The Company shall have received a certificate of the President of PPDA and Purchaser, dated the Closing Date, in form and substance satisfactory to the Company, certifying that the conditions to the obligations of the Company and the Shareholders have been fulfilled.

### 6.4    Security Agreement

PPDA shall have executed and delivered the Security Agreement representing the Shareholders' secured interest in the Company's residual income securing payment of the Second Installment and the Third Installment, subject to the Purchase Price Installment Adjustment. The parties shall file attendant UCC-1 Financing Statements.

### 6.5    Confidentiality, Non-circumvention Agreements

PPDA shall have executed and delivered the Confidentiality, Noncircumvention Agreements or agreements with covenants regarding confidentiality and noncircumvention.

### 6.6    Approvals and Consents

All transfers of permits or licenses, all approvals of or notices to public agencies, federal, state, local or foreign, the granting or delivery of which is necessary for the consummation of the transactions contemplated hereby or for the continued operation of the Company, shall have been obtained, and all waiting periods specified by law shall have passed. All other consents, approvals and notices to such third parties as contractually required shall have been obtained or delivered.

### 6.7    Proceedings and Documents; Secretary's Certificate

PPDA and Purchaser shall have each delivered a Certificate of the Secretary, in form and substance reasonably satisfactory to the Company, as to the authenticity and effectiveness of the actions of the Board of Directors of the Purchaser and the Board of Directors of PPDA (and, as applicable, the Shareholder of PPDA) authorizing the Merger and the transactions contemplated by this Agreement and the Related Documents, and as to PPDA's and the Purchaser's charter documents and such other documents as are reasonably specified by the Company's counsel.

### 6.8    Compliance With Laws

The consummation of the transactions contemplated by this Agreement and the Related Documents shall be legally permitted by all laws and regulations to which the Purchaser, PPDA or the Company is subject.

### 6.9    Material Adverse Change

Since the date of this Agreement and through the Closing, there shall not have occurred (i) any material adverse change (except as otherwise disclosed on the

- 36 -

Schedule of Exceptions) in the operations of PPDA and Purchaser; (ii) change in any domestic or foreign laws or regulations which has a material adverse effect on the operations of PPDA and Purchaser; or (iii) any change in any third party contractual or other business relationships of PPDA and the Purchaser which has a material adverse effect on the operations of PPDA and the Purchaser.

### 6.10    Legal Proceedings

No order of any court or administrative agency shall be in effect which enjoins, restrains, conditions or prohibits consummation of this Agreement or any Related Document, and no litigation, investigation or administrative proceeding shall be pending or threatened' which would enjoin, restrain, condition or prevent consummation of this Agreement or any Related Document.

### 6.11    Board Approval

The Board of Directors of PPDA and the Purchaser have approved the transaction, this Agreement and the Related Documents and the transactions contemplated thereby and any and all other requisite approvals have been obtained.

### 6.12    Compliance Certificates; Resolutions

The Company shall have received a certificate of the President of the PPDA and Purchaser, dated the Closing Date, in form and substance satisfactory to the Company, certifying that the conditions to the obligations of PPDA and the Purchaser have been fulfilled. The Company shall have received a certificate of the Secretary of the PPDA and Purchaser listing each officer of the PPDA and Purchaser authorized to execute the Agreement and Related Documents and providing signature specimens.

### 6.13    Consents to Merger

The Company shall have received from PPDA and the Purchaser duly executed copies of all consents, approvals or authorizations of or from any Person that may be required under the terms of any contract, agreement or other instrument for or as a result of the consummation of the transactions contemplated hereby, all in form and substance reasonably satisfactory to the Company.

### 6.14    Notes

Each of PPDA and Purchaser shall have executed and delivered the Note.

## ARTICLE VII - TERMINATION, ETC.

### 7.1   Termination

This Agreement may be terminated and the Merger may be abandoned at any time prior to the Effective Time (notwithstanding any approval of this Agreement by the Shareholders):

(a)    by mutual written consent duly authorized by the Board of Directors of the Company and PPDA;

(b)    by either the Company or PPDA, if there shall be any law or regulation that makes consummation of the Merger illegal or otherwise prohibited or if any judgment, injunction, order or decree enjoining PPDA, the Purchaser, the Company or the Shareholders from consummating the Merger is entered and such judgment, injunction, order or decree shall become final and nonappealable; provided, however, that the party seeking to terminate this Agreement pursuant to this subsection (b) shall have used all reasonable efforts to remove such judgment, injunction, order or decree;

(c)    by the Company, in the event of a material breach by PPDA of any representation, warranty or agreement contained herein which has not been cured or is not curable 30 days after written notice;

(d)    by PPDA, in the event of a material breach by the Company of any representation, warranty or agreement contained herein which has not been cured or is not curable 30 days after written notice;

(e)    by either the Company or PPDA, in the event of the failure of its respective board of director to approve the transaction;

(f)    by PPDA, in the event that the Company is unable to obtain the written consents from the third parties listed in Schedule 2.3(c) by the date of Closing except as waived by PPDA;

(g)    by either the Company or PPDA if the Closing has not occurred by June 30, 2006.

### 7.2   Effect of Termination

(a)    In the event this Agreement is terminated by the Company or PPDA under Section 7.1, there shall be no further obligation on the part of any party hereto.

- 38 -

(b)    Prior to the earlier of Closing or the termination of this Agreement, neither the Purchaser, PPDA nor the Company will, without the prior written permission from the other, either for itself or for any other person or entity, directly or indirectly, solicit, induce or attempt to induce any officer, employee or independent contractor of the other, or any client or customer of the other to terminate his or her employment or business relationship with the other party; provided that nothing contained in this Section 7.2(e) shall restrict any general advertisement or solicitation by any party hereto which is not directly at any particular officer or employee.

(c)    Neither the Purchaser, PPDA, the Company nor any of their respective Affiliates will at any time during or after the expiration or termination of this Agreement directly or indirectly disclose to any third party or use any information identified in writing as confidential (the "Confidential Information") for any purpose not directly associated with the transactions contemplated by this Agreement without the express prior written consent of the party providing such Confidential Information. Confidential Information shall not include: (i) information that is or becomes publicly available other than as a result of a breach of this Agreement by the receiving party; (ii) information that is disclosed to the receiving party by any third party that the receiving party reasonably believes was entitled to disclose such information to the receiving party; (iii) information that is known to the receiving party prior to the date of that certain Letter of Intent dated April XX, 2006 between the Purchaser and the Company, or that the receiving party develops independently without use of the Confidential Information; and (iv) information that the disclosing party discloses to any person or entity without confidentiality restrictions.

## ARTICLE VIII - SURVIVAL AND INDEMNIFICATION

### 8.1    Survival

Regardless of any investigation made by the parties in connection with this Agreement, (a) the representations and warranties of the parties contained in Articles II and III (including, without limitation, the Schedule of Exceptions) shall survive the Closing for a period of thirteen months after the Closing Date; provided, however, that the representations and warranties of the Company and the Shareholders contained in Sections 2.12 (Taxes), 2.13 (Employee Benefit Plans), 2.21 (Absence of Questionable Payments) and 2.23 (Compliance With Environmental Laws) shall survive the Closing until the expiration of the applicable statute of limitations for the matters addressed in each such representation and warranty; and provided further, that the representations and warranties of the Company and the Shareholders contained in Sections 2.1 (Organization and Good Standing), 2.2 (Authority and Enforceability;

- 39 -

Good Title), 2.4 (Capitalization) and 2.19 (Financial Advisors) and the representations and warranties of PPDA and the Purchaser contained in Sections 3.1 (Organization and Good Standing) and 3.2 (Authority and Enforceability) shall survive the Closing for a period of two years after the Closing Date, and (b) each agreement and covenant set forth in this Agreement that by its terms is to be performed after the Closing Date shall survive the Closing and continue until such covenant or agreement has been fully performed. No claim for indemnification in respect of Losses (as defined below) arising in connection with this Agreement (a "Claim") may be brought by any Person unless written notice of such Claim shall have been given as provided in this Article VIII on or prior to the last day of the applicable survival period as provided in the preceding sentence (in which event each provision of this Agreement on which such Claim is based shall, with respect to such Claim, survive the applicable survival period until such Claim is finally resolved and all obligations with respect thereto are fully satisfied).

### 8.2    Indemnification

(a)    The Shareholders agree jointly and severally to indemnify PPDA and the Purchaser, their successors and assigns, and the officers, directors, Affiliates, employees, controlling Persons and agents of the foregoing ("PPDA's Indemnified Persons"), and to hold each of them harmless against and in respect of any and all losses, damages, debts, liabilities, obligations, judgments, orders, awards, writs, injunctions, decrees, fines, penalties, Taxes, costs or expenses (including, without limitation, any reasonable legal or accounting fees or expenses and any consequential damages) ("Losses") incurred by any of them by reason of (i) a breach of any of the representations or warranties made by the Company, the Shareholders or a Shareholder in Article II (such representations and warranties being deemed for purposes of this Article VIII to be made as of the Closing Date) or (ii) the nonperformance (whether partial or total) of any agreements or covenants made by the Company or any Shareholder in this Agreement unless waived. The Purchaser and PPDA acknowledge and agree that, subject only to the right of the PPDA's Indemnified Persons to seek specific performance or injunctive relief, the foregoing indemnification provisions in this Section 8.2(a) shall be the sole and exclusive remedy of PPDA and the Purchaser under this Agreement.

(b)    PPDA agrees to indemnify and hold harmless the Shareholders and, as appropriate, the Company, against and in respect of any and all Losses, incurred by them by reason of (i) a breach of any of the representations or warranties made by PPDA or the Purchaser in Article III (such representations and warranties being deemed for purposes of this Article VIII to be made as of the Closing Date); (ii) the nonperformance (whether partial or total) of any agreements or covenant made

- 40 -

by PPDA or the Purchaser in this Agreement; or (iii) claims identified on <u>Schedule 8.2</u>. The Shareholders, the Purchaser and PPDA acknowledge and agree that, subject only to the right of Shareholders to seek specific performance or injunctive relief, the foregoing indemnification provisions in this Section 8.2(b) shall be the sole and exclusive remedy of the Shareholders with respect to this Agreement.

(c)     With respect to Claims made by third parties, if any Person entitled to indemnification pursuant to this Section 8.2 (an "<u>Indemnitee</u>") is threatened in writing with any Claim, or any Claim is presented in writing to, or any action or proceeding is formally commenced against, any Indemnitee that may give rise to the right of indemnification hereunder, such Indemnitee will promptly give written notice thereof to each indemnifying party; provided, however, that any delay by an Indemnitee in so notifying the indemnifying party shall not relieve the indemnifying party of any liability to any of the Indemnitees hereunder, except to the extent that the indemnifying party shall have been actually prejudiced as a result of such failure.

(d)     The indemnifying party or parties, by delivery of written notice to an Indemnitee within 30 days of notice of a Claim from an Indemnitee, may elect to assume the defense of such Claim at the indemnifying party's expense; provided, however, that (i) counsel undertaking such defense shall be reasonably acceptable to the Indemnitee; (ii) the indemnifying parties shall mutually elect to contest such Claim and shall conduct and settle such contest in a joint manner, and if the indemnifying parties shall fail at any time to agree, the Indemnitee shall have no obligation to contest such Claim; and (iii) if the Indemnitee requests in writing that such Claim not be contested, then it shall not be contested but shall not be covered by the indemnities provided herein. The indemnifying parties shall have the right to settle, compromise or discharge a third party claim (other than any such third party claim in which criminal conduct is alleged) without the Indemnitee's consent if such settlement, compromise or discharge (i) constitutes a complete and unconditional discharge and release of all Indemnitees and (ii) provides for no relief other than the payment of monetary damages and such monetary damages are paid in full by the indemnifying party, (iii) and does not admit fault on the part of the Indemnitees, and in all other cases may not so settle without the prior written consent of the Indemnitee. If the indemnifying parties do not jointly elect to contest an indemnifiable matter, they shall cooperate with the Indemnitee to the extent any of them has knowledge of facts or circumstances relating to such matter, and the Indemnitee shall have the exclusive right to prosecute, defend, compromise, settle or pay any Claim, but the Indemnitee shall not be obligated to do so; provided, however, that, should the Indemnitee elect not to exercise its right exclusively to prosecute, defend, compromise, settle or pay such Claim, any indemnifying party may elect to do so at such party's sole expense.

(e)    No Claim under this Section 8.2(a) shall be made unless the aggregate amount of any such Claim or Claims exceeds US$100,000 (the "Basket Amount"); provided, however, that the foregoing Basket Amount shall not apply to any Claim resulting from any breach or inaccuracy of the representations, warranties or agreements of the Shareholders or a Shareholder contained in Sections 2.1 (Organization and Good Standing), 2.2 (Authority and Enforceability; Good Title), 2.4 (Capitalization), 2.12 (Taxes), 2.13 (Employee Benefit Plans) and 2.18 (Financial Advisors).

(f)    No Shareholder shall be entitled to make any Claim against the Company or any of its Affiliates by reason of the fact that he or she was a controlling person, director, officer, employee, agent or other representative of the Company (whether such Claim is for Losses of any kind or otherwise and whether such Claim is pursuant to any statute, charter, bylaw, contractual obligation or otherwise) with respect to any action brought by any Indemnitee against such Shareholder in accordance with this Section 8.2 (whether such action is pursuant to this Agreement, applicable law or otherwise) or otherwise based on any facts or circumstances that have resulted in any Losses to any Indemnitee covered by this Section 8.2, whether or not a Claim for indemnification in respect thereof has been made against such Shareholder. Except as specifically provided herein, this Section 8.2(f) shall not reduce or eliminate any indemnification to which a Shareholder would otherwise be entitled by Law in respect of actions taken by such Shareholder in his or her capacity as an officer or director of the Company that do not result in any Losses to any Indemnitee covered by this Section 8.2(f).

(g)    The parties agree that the Shareholders' indemnification obligations to the PPDA Indemnified Parties and the PPDA's indemnification obligations to the Shareholders under this Agreement shall be capped at the Purchase Price, applying the Adjustment, if any.

## ARTICLE IX - GENERAL PROVISIONS

### 9.1    Expenses

Except as otherwise set forth herein, all costs and expenses, including all fees and expenses of attorneys, investment bankers, lenders, financial advisers and accountants, in connection with the negotiation, execution and delivery of this Agreement and the consummation of the transactions contemplated hereby and thereby, shall be paid by the party incurring such costs and expenses. Such fees and expenses shall be paid as incurred and shall be payable whether or not the merger contemplated by this Agreement is consummated.

- 42 -

## 9.2    Notices

Any notice or demand desired or required to be given hereunder shall be in writing given by personal delivery, certified or registered mail, confirmed facsimile transmission, or overnight courier service, in each case addressed as respectively set forth below or to such other address as any party shall have previously designated by such a notice. The effective date of any notice or request shall be the date of personal delivery, four days after the date of mailing by certified or registered mail, the date on which successful facsimile transmission is confirmed, or the day following the date deposited with a reputable overnight courier service for overnight delivery, as the case may be, in each case properly addressed as provided herein and with all charges prepaid.

TO PPDA OR THE PURCHASER:

PIPELINE DATA INC.
12 West Main Street
Brasher Falls, New York 13613
ATTN: Donald Gruneisen
Facsimile: 315-389-5333

with a copy, which shall not constitute notice, to:

Sheila Corvino, Esq.
811 Dorset West Road
Dorset, Vermont 05251
Facsimile: 802-867-2468

TO THE COMPANY:

VALADATA, INC.
Attn: Daniel Erickson
9633 S. 48th Street, Suite #100
Phoenix, AZ 85044
Facsimile:

with a copy to:

> Quarles & Brady Streich Lang LLP
> Attn: Leezie Kim
> Two North Central Avenue
> Phoenix, AZ 85004
> Facsimile: 602-417-2984

> TO THE SHAREHOLDERS:
> Daniel Erickson
> 9633 S. 48th Street, Suite #100
> Phoenix, AZ 85044

## 9.3    Severability

If any term or other provision of this Agreement is determined by a court or by arbitration to be invalid, illegal or incapable of being enforced under any rule of law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible.

## 9.4    Entire Agreement

All prior or contemporaneous agreements, contracts, promises, representations and statements among the parties to this Agreement as to the subject matter hereof (other than the Exhibits and Schedules to this Agreement and the other agreements specifically mentioned in this Agreement, and the certificates and other documents delivered pursuant to this Agreement or in connection herewith (together with this Agreement, the "Transaction Documents")) are merged into this Agreement. The Transaction Documents set forth the entire understanding and agreement among the parties with respect to the subject matter hereof and thereof, and there are no terms, conditions, representations, warranties or covenants other than those contained in the Transaction Documents or supplied by law

### 9.5    Assignment

This Agreement shall not be assigned by operation of law or otherwise without the prior written consent of the Purchaser, the Company and the Shareholders holding a majority of Shares immediately prior to the Closing; provided, however, that after the Closing the Surviving Corporation may, without such consent, assign this Agreement to PPDA and PPDA may, without such consent, assign its rights under this Agreement to a subsidiary or a controlled corporation.

### 9.6    Parties in Interest

This Agreement shall be binding upon and inure solely to the benefit of each party hereto and its permitted assigns, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

### 9.7    Specific Performance

Each of the parties acknowledges and agrees that the other parties hereto would be damaged irreparably in the event that, prior to the Closing, any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached. Accordingly, each of the parties hereto agrees that the other parties hereto shall be entitled, prior to the Closing, to an injunction to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any court of competent jurisdiction, in addition to any other remedy to which they may be entitled at law or in equity.

### 9.8    Governing Law

This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware applicable to contracts executed in and to be performed in that State, without regard to principles of conflicts of laws.

### 9.9    Headings

The descriptive headings contained in this Agreement are included for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

### 9.10    Counterparts

This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, and by the different parties hereto in

separate counterparts, each of which when executed and delivered shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

### 9.11   Waiver of Jury Trial

To the extent not prohibited by applicable law which cannot be waived, each of the parties hereto hereby waives and covenants that it will not assert (whether as plaintiff, defendant or otherwise) any right to trial by jury in any forum in respect of any issue or action arising out of or based upon this Agreement or any Related Document or agreement contemplated hereby or the subject matter hereof or thereof or in any way connected with or related or incidental to the transactions contemplated hereby, in each case whether now existing or hereafter arising. Each party acknowledges that it has been informed by the other parties that this Section 9.11 constitutes a material inducement upon which such other parties are relying and will rely in entering into this Agreement and any other agreements relating hereto or contemplated hereby. Any party hereto may file an original counterpart or a copy of this Section 9.11 with any court as written evidence of the consent of each such party to the waiver of its right to trial by jury.

### 9.12   Consent to Jurisdiction

Each party to this Agreement, by its execution hereof, (a) hereby irrevocably submits to the nonexclusive jurisdiction and venue of the state and federal courts located in Norfolk County, Massachusetts or Maricopa County, Arizona for the purpose of any Action arising out of or based upon this Agreement or relating to the subject matter hereof, (b) waives, to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such action, any Claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that any such proceeding brought in one of the above-named courts is improper, or that this Agreement or the subject matter hereof may not be enforced in or by such court, and (c) agrees not to commence any action arising out of or based upon this Agreement or relating to the subject matter hereof other than before one of the above-named courts or to make any motion or take any other action seeking or intending to cause the transfer or removal of any such action to any court other than one of the above-named courts whether on the grounds of inconvenient forum or otherwise. Each party hereby consents to service of process in any such proceeding in any manner permitted by the laws of the State in which such proceeding was commenced, and agrees that service of process may be by registered or certified mail, return receipt requested.

- 46 -

**9.13   Amendment**

This Agreement may not be amended except by an instrument in writing signed by PPDA, the Company and the Shareholders by unanimous vote immediately prior to the Closing.

**9.14   Attorneys' Fees**

In the event of any action to enforce this Agreement, for interpretation or construction of this Agreement or on account of any breach of or default under this Agreement, the prevailing party in such action shall be entitled to recover, in addition to all other relief, from the other party all reasonable attorneys' fees incurred by the prevailing party in connection with such action (including, but not limited to, any appeal thereof); provided, however, that if more than one item is disputed and the final decision is against each party as to one or more of the disputed items, then such attorneys' fees shall be apportioned in accordance with the monetary values of the items decided against each party.

**9.15   Signatures.** This Agreement shall be effective upon delivery of original signature pages or facsimile copies thereof executed by each of the parties (or upon copies of such signature pages contained in portable data format (pdf) files being sent to the other parties via e-mail).

**9.16   Potential Restructure.**

(a)   The Shareholders of the Company intend to restructure the ownership of the Company immediately prior the Closing. In the restructure, the Shareholders will transfer their Shares in exchange for common stock of a newly formed Arizona corporation, L60, Incorporated. L60, Incorporated will become the sole shareholder of the Company. Immediately prior to the Closing, the Company will transfer the Plans (as defined in Section 2.13) to L60, Incorporated. It is intended that after the transfer of the Plans to L60, Incorporated, the Company, PPDA and the Purchaser will have no liability with respect to the Plans.

(b)   Upon the consummation of the restructure, the parties to this Agreement agree that (i) L60, Incorporated shall become the "Shareholder" for purposes of all the Transaction Documents; (ii) Dan Erickson, Sean Kramer and Jason Kujanson (the "Former Shareholders") shall become additional parties who are jointly and severally providing the representations and warranties in Article II to Purchaser and PPDA (except that each individual represents and warrants only as to himself with respect to Sections 2.2(b) and 2.2(c) and 2.27); (iii) the Former Shareholders will each additionally execute and deliver a Confidentiality and Non-circumvention Agreement

- 47 -

at the Closing, the delivery of which shall be a closing condition to the Purchaser's requirement to close.

[Remainder of this page intentionally left blank]

- 48 -

IN WITNESS WHEREOF, the parties hereto have entered into and signed this Agreement as of the date and year first above written.

PIPELINE DATA INC.

By: _____
Name: _____
Title: _____

VALADATA, INC.

By: _____
Name: _____
Title: _____

SHAREHOLDERS:

_____
Dan Erickson

_____
Sean Kramer

_____
Jason Kujanson

For purposes of the potential restructure described in Section 9.16,

L60, INCORPORATED

_____
By:  Dan Erickson
Its:  President

- 49 -

## EXHIBIT A

| Name of Shareholder | Shares of Valadata, Inc. Owned |
|---|---|
| Dan Erickson | 5,000 |
| Sean Kramer | 5,000 |
| Jason Kujanson | 5,000 |

If the restructure described in Section 9.16 occurs prior to the closing, the capitalization of the Company will change to as follows:

| Name of Shareholder | Shares of Valadata, Inc. Owned |
|---|---|
| L60, Incorporated | 15,000 |

QBPHX\125765.00002\2011706.8

## Exhibit B

Certificate of Merger (DE) and Articles of Merger (ND)
*[to come from Purchaser]*

Exhibit C

Articles of Incorporation of Company

Exhibit "G"

## SECOND AND THIRD INSTALLMENT SECURED PROMISSORY NOTE

Up to $1,565,262.10                                                July /o, 2006

FOR VALUE RECEIVED, the undersigned, PIPELINE DATA INC. ("PPDA") hereby promises to pay to L60, Incorporated (the "Shareholders"), the principal sum of up to one million five hundred sixty five thousand two hundred sixty two and 10/100 ($1,565,262.10), with no interest on the Second Installment and Third Installment Maturity Dates (as defined herein), subject to the terms and conditions of this note (the "Note")

This Note is provided pursuant to that certain Merger Agreement made by and among the PPDA, Valadata Acquisition, Inc. (the "Purchaser") the Shareholders and Valadata, Inc. (the "Company") (the "Merger Agreement") as well as that certain Security Agreement between Shareholders and Valadata, Inc. (the "Security Agreement"), each dated as of the date hereof. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Merger Agreement or the Security Agreement.

Pursuant to the Merger Agreement, PPDA and the Purchaser are acquiring the Company by way of reverse merger of the Purchaser into the Company for the Purchase Price. The Purchase Price is subject to the Adjustment.

Payment of the Purchase Price is structured to be made in three (3) installments (the "Installments") as follows: an initial payment at the Closing; the Second Installment; and the Third Installment. This Note evidences the obligation to pay the Second and Third Installments. Notwithstanding the forgoing, the requirement to pay the Second and Third Installments is subject to the Adjustment as set forth in the Merger Agreement.

1.      The Second Installment and the Adjustment.  The Second Installment is payable on the first anniversary of the Closing Date (the "Second Installment Maturity Date"), subject to the Adjustment, which such Adjustment may entirely remove the obligation to pay the Second Installment.

2.      The Third Installment and the Adjustment.  The Third Installment is payable on the second anniversary of the Closing Date (the "Third Installment Maturity Date"), subject to the Adjustment, which such Adjustment may entirely remove the obligation to pay the Third Installment.

3.      Security Agreement.  This Note is secured by the assets of Valadata, Inc. pursuant to the Security Agreement.

4.      Events of Default; Acceleration on Default; Waivers.  Upon the occurrence and continuance of an Event of Default beyond any applicable grace period, all sums of principal and other fees then remaining unpaid hereon and all other amounts payable hereunder become immediately due and payable without further action by the Shareholders. An occurrence of any of the following is Event of Default:

(a)     PPDA fails to pay when due the principal in accordance herewith and such failure continues for a period of 10 days following the date upon which any such payment was due

(b)     Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings or relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against PPDA or Valadata, Inc., unless in any case such proceedings or process is stayed, withdrawn, dismissed, or vacated, as the case may be, within 60 days.

5.     PPDA HEREBY WAIVES THE APPLICATION OF ANY AND ALL OF ITS RIGHTS AND POWERS UNDER ALL STATUTES OF LIMITATION AND SIMILAR STATUTES AND LAWS AS TO THIS NOTE. DEMAND, PRESENTMENT FOR PAYMENT AND PROTEST HEREBY ARE WAIVED BY PPDA AND EVERY ENDORSER AND/OR GUARANTOR HEREOF.

6.     Notice. All notices and other communications under this Note shall be in writing and shall be given in accordance with the notice provisions contained in Section 9.2 of the Merger Agreement.

7.     Waivers; Continued Liability. It is agreed that the granting to PPDA or any other party of an extension or extensions of time for the payment of any sum or sums due under this Note or the exercising or failure to exercise of any right or power under this Note, shall not in any way release or affect the liability of PPDA evidenced by this Note. It is agreed that prior to this Note becoming due and payable, an assessment of the amount of Qualifying Income must be made.

8.     Amendments and Modifications. This Note may not be amended or modified, nor shall any revision hereof be effective, except by an instrument in writing expressing such intention executed by Shareholders and directed to PPDA.

9.     Choice of Law; Dispute Resolution. This Note is made and entered into under the laws of the State of Arizona, and the laws of that State (without giving effects to the principles of conflicts of laws thereof) shall govern the validity and interpretation hereof and the performance by the parties hereto of their respective duties and obligations hereunder.

10.     Binding Effect. Wherever the term "PPDA" is used in this Note, the term shall include (unless otherwise expressly indicated) all of PPDA's successors, and assigns, as the case may be. This Note shall be binding upon PPDA and shall inure to the benefit of Shareholders and its successors and assigns.

11.     Severability. Any provision of this Note which is unenforceable or contrary to applicable law, the inclusion of which would affect the validity, legality or enforcement of this Note, shall be of no effect, to the extent of such prohibition or invalidity, and in such case all the remaining terms and provisions of this Note shall be fully effective, the same as though no such invalid provision had ever been included in this Note.

12.    Unconditional Obligation; Waivers Notices:

12.1    No forbearance, indulgence, delay or failure to exercise any right or remedy with respect to this Note shall operate as a waiver, nor as an acquiescence in any default, nor shall any single or partial exercise of any right or remedy preclude any other or further exercise thereof or the exercise of any other right or remedy.

12.2    The headings of the various paragraphs of this Note are for convenience of reference only and shall in no way modify any of the terms or provisions of this Note.

IN WITNESS WHEREOF, the undersigned has executed and delivered this Note as of the day and year first above written.

PIPELINE DATA, INC.

BY: _____

ITS: _C.E.O._____

Exhibit "H"

**PIPELINE DATA INC.**
**VALADATA, INC.**
**SECOND AND THIRD INSTALLMENT SECURITY AGREEMENT**

July *10*, 2006

To:  L60, Incorporated
9633 S. 48th Street, Suite #100
Phoenix, AZ 85044

Gentlemen:

1.    To secure the payment of all Obligations (as hereafter defined), we hereby grant to you a continuing security interest in all of the following property now owned or at any time hereafter acquired by Valadata Inc., or in which Valadata, Inc. now has or at any time in the future may acquire any right, title or interest (the "Collateral"): all cash, accounts, accounts receivable, deposit accounts (including, without limitation, inventory, equipment, goods, documents, instruments (including, without limitation, promissory notes), contract rights, general intangibles (including, without limitation, payment intangibles and an absolute right to license on terms no less favorable than those currently in effect among our affiliates, but not own intellectual property), chattel paper, supporting obligations, investment property, letter-of-credit rights, trademarks and tradestyles in which Valadata, Inc. now has or hereafter may acquire any right, title or interest, all proceeds and products thereof (including, without limitation, proceeds of insurance) and all additions, accessions and substitutions thereto or therefore. In the event we wish to finance the acquisition of any hereafter acquired equipment and has obtained a commitment from a financing source to finance such equipment from an unrelated third party, you agree to release your security interest on such hereafter acquired equipment so financed by such third party financing source.

2.    The term "Obligations" as used herein shall mean and include all debts, liabilities and obligations owing by Pipeline Data, Inc. to you hereunder and under whether arising under, out of, or in connection with that certain Second and Third Installment Secured Promissory Note dated as of the date hereof made by Pipeline Data, Inc. in your favor in the amount of $1,565,262.10 (the "Term Note"). Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in that certain Merger Agreement made by and among the Pipeline Data, Inc., Valadata Acquisition, Inc. the Shareholders of Valadata, Inc. and Valadata, Inc. (the "Merger Agreement").

3.      We hereby represent, warrant and covenant to you that:

(a)      Valadatata, Inc. ("Valadata") is a company validly existing, in good standing and formed under the laws of the State of North Dakota and will provide you thirty (30) days' prior written notice of any change in our state of formation;

(b)      Valadata's legal name is VALADATA, INC., as set forth in its Articles of Incorporation, as amended through the date hereof;

(c)      Valadata is the lawful owner of the Collateral and has the sole right to grant a security interest therein and will defend the Collateral against all claims and demands of all persons and entities;

(d)      Valadata will keep the Collateral free and clear of all attachments, levies, taxes, liens, security interests and encumbrances of every kind and nature ("Encumbrances"), except (i) any Encumbrance subordinate to the Obligations or (ii) to the extent said Encumbrance does not secure indebtedness in excess of $100,000 and such Encumbrance is removed or otherwise released within twenty (20) days of the creation thereof;

(e)      Valadata will at our own cost and expense keep the Collateral in good state of repair (ordinary wear and tear excepted) and will not waste or destroy the same or any part thereof other than ordinary course discarding of items no longer used or useful in our business;

(f)      Valadata will not, without your prior written consent, sell, exchange, lease or otherwise dispose of the Collateral, whether by sale, lease or otherwise, except for the sale of inventory in the ordinary course of business and for the disposition or transfer in the ordinary course of business during any fiscal year of obsolete and worn-out equipment or equipment no longer necessary for our ongoing needs, having an aggregate fair market value of not more than $100,000 and only to the extent that:

(i)      the proceeds of any such disposition are used to acquire replacement Collateral which is subject to your first priority security interest (subject to the $100,000 allowance set forth in paragraph (f) of this Section 3) or are used to repay Obligations or to pay general corporate expenses; or

(ii)      the proceeds of which are remitted to you to be held as cash collateral for the Obligations;

(g)      we will insure the Collateral in your name (to the extent insurance is customary business practice) against loss or damage by fire, theft, burglary, pilferage, loss in transit and such other hazards as you shall reasonably specify in amounts and under policies by insurers reasonably acceptable to you and all premiums thereon shall be paid by us and the policies delivered to you. If we fail to do so, you may procure such insurance and the cost thereof shall constitute Obligations;

408837-4
QBPHX\125765.00002\2011709.2

(h)    Valadata will at all reasonable times allow you or your representatives free access to and the right of inspection of the Collateral;

(i)    Valadata will hereby indemnify and save you harmless from all loss, costs, damage, liability and/or expense, including reasonable attorneys' fees, that you may sustain or incur to enforce payment, performance or fulfillment of any of the Obligations and/or in the enforcement of this Agreement or in the prosecution or defense of any action or proceeding either against you or us concerning any matter growing out of or in connection with this Agreement, and/or any of the Obligations and/or any of the Collateral except to the extent caused by your own gross negligence or willful misconduct.

4.    We shall be in default under this Agreement upon the happening of any of the following events or conditions, each such event or condition an "Event of Default:"

(a)    we shall fail to pay when due or punctually perform any of the Obligations and such failure shall continue for a period of ten (10) days following any failure to make payment, or for a period of thirty (30) days following default for any other such failure;

(b)    any covenant, warranty, representation or statement made or furnished to you by us or on our behalf was false in any material respect when made or furnished;

(c)    the loss, theft, substantial damage, destruction, sale or encumbrance to or of any of the Collateral or the making of any levy, seizure or attachment thereof or thereon except to the extent:

(i)    such loss is covered by insurance proceeds which are used to replace the item or repay us; or

(ii)    said levy, seizure or attachment does not secure indebtedness in excess of $100,000 and such levy, seizure or attachment has not been removed or otherwise released within twenty (20) days of the creation or the assertion thereof;

(d)    Valadata shall become insolvent, cease operations, dissolve, terminate our business existence, make an assignment for the benefit of creditors, suffer the appointment of a receiver, trustee, liquidator or custodian of all or any part of our property;

(e)    any proceedings under any bankruptcy or insolvency law shall be commenced by or against Valadata and if commenced against us shall not be dismissed within sixty (60) days;

(f)    we shall repudiate, purport to revoke or fail to perform any of our obligations under the Note (after passage of applicable cure period, if any), notwithstanding the foregoing, a repudiation based on the Adjustment resulting in cancellation of one or both of the Notes is not an Event of Default; or

(g)    an Event of Default shall have occurred under and as defined in the Note.

3

5.     Upon the occurrence of any Event of Default and at any time thereafter, you may declare all Obligations immediately due and payable and you shall have the remedies of a secured party provided in the Uniform Commercial Code as in effect in the State of New York, this Agreement and other applicable law. Upon the occurrence of any Event of Default and at any time thereafter, you will have the right to take possession of the Collateral and to maintain such possession on our premises or to remove the Collateral or any part thereof to such other premises as you may desire. Upon your request, we shall assemble the Collateral and make it available to you at a place designated by you. If any notification of intended disposition of any Collateral is required by law, such notification, if mailed, shall be deemed properly and reasonably given if mailed at least ten (10) days before such disposition, postage prepaid, addressed to us either at our address shown herein or at any address appearing on your records for us. All notices shall be sent though a nationally reputable overnight courier to arrive the next day. Any proceeds of any disposition of any of the Collateral shall be applied by you to the payment of all expenses in connection with the sale of the Collateral, including reasonable attorneys' fees and other legal expenses and disbursements and the reasonable expense of retaking, holding, preparing for sale, selling, and the like, and any balance of such proceeds may be applied by you toward the payment of the Obligations in such order of application as you may elect, and we shall be liable for any deficiency.

6.     If we default in the performance or fulfillment of any of the terms, conditions, promises, covenants, provisions or warranties on our part to be performed or fulfilled under or pursuant to this Agreement, you may, at your option without waiving your right to enforce this Agreement according to its terms, immediately or at any time thereafter and without notice to us, perform or fulfill the same or cause the performance or fulfillment of the same for our account and at our sole cost and expense, and the cost and expense thereof (including reasonable attorneys' fees) shall be added to the Obligations and shall be payable on demand with interest thereon at the highest rate permitted by law or, at your option, debited by you from the Collateral.

7.     We appoint you, any of your officers, employees or any other person or entity whom you may designate as our attorney, with power to execute such documents in our behalf and to supply any omitted information and correct patent errors in any documents executed by us or on our behalf; to file financing statements against us covering the Collateral; to sign our name on public records; and to do all other things you deem necessary to carry out this Agreement. We hereby ratify and approve all acts of the attorney and neither you nor the attorney will be liable for any acts of commission or omission, nor for any error of judgment or mistake of fact or law other than gross negligence or willful misconduct. This power being coupled with an interest, is irrevocable so long as any Obligations remains unpaid.

8.     No delay or failure on your part in exercising any right, privilege or option hereunder shall operate as a waiver of such or of any other right, privilege, remedy or option, and no waiver whatever shall be valid unless in writing, signed by you and then only to the extent therein set forth, and no waiver by you of any default shall operate as a waiver of any other default or of the same default on a future occasion. Your books and records containing entries with respect to the Obligations shall be admissible in evidence in any action or proceeding, shall be binding upon us for the purpose of establishing the items therein set forth and shall constitute prima facie proof thereof. You shall have the right to enforce any one or more of the remedies

4

408837-4
QBPHX\125765.00002\2011709.2

available to you, successively, alternately or concurrently.  We agree to join with you in executing financing statements or other instruments to the extent required by the Uniform Commercial Code in form satisfactory to you and in executing such other documents or instruments as may be required or deemed necessary by you for purposes of affecting or continuing your security interest in the Collateral.

9.    This Agreement shall be governed by and construed in accordance with the laws of the State of Arizona and cannot be terminated orally.  All of the rights, remedies, options, privileges and elections given to you hereunder shall inure to the benefit of your successors and assigns.  The term "you" as herein used shall include your company, any parent of your company, any of your subsidiaries and any co-subsidiaries of your parent, whether now existing or hereafter created or acquired, and all of the terms, conditions, promises, covenants, provisions and warranties of this Agreement shall inure to the benefit of and shall bind the representatives, successors and assigns of each of us and them.  You and we hereby (a) waive any and all right to trial by jury in litigation relating to this Agreement and the transactions contemplated hereby and we agree not to assert any counterclaim in such litigation, (b) submit to the nonexclusive jurisdiction of any Arizona State court sitting in Maricopa Countyand (c) waive any objection you or we may have as to the bringing or maintaining of such action with any such court.

10.    This Agreement terminates immediately upon cancellation of the Notes whether by payment or removal of obligations thereunder as a result of the Adjustment.  All notices from you to us shall be sufficiently given if mailed or delivered to us at our address set forth below.

11.    All notices from you to us shall be sufficiently given if mailed or delivered to us at our address set forth below.

5

Very truly yours,

VALADATA, INC.

By: _____
Name: _____
Title: _____

ACKNOWLEDGED:

L60, INCORPORATED

By: _____
    Name: Dan Erickson
    Title:  President

Address:    1515 Hancock Street, Suite 301,
            Hancock Plaza
            Quincy, Massachusetts 02169

Attention:  Donald Gruneisen,
            Facsimile: 315-389-5333

With copy to:  Sheila Corvino, Esq.
               811 Dorset West Road
               Dorset , Vermont 05251
               Facsimile: (802) 867-2468

6

408837-4
QBPHX\125765.00002\2011709.2

Exhibit "I"

██████████████
██████████████
██████████████

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Valerie Fell
CT Corporation System
Dallas UCC Team 1
350 N. St. Paul Street, Suite 2900
Dallas, Texas 75201

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 08:53 PM 09/19/2007
INITIAL FILING # 2007 3550307

SRV: 071033652

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME | | | | |
| VALADATA ACQUISITION, INC. | | | | |
| OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 1c. MAILING ADDRESS c/o Corporation Service Co. | CITY | STATE | POSTAL CODE | COUNTRY |
| 2711 Centerville Road, Suite 400 | Wilmington | DE | 19808 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION Corporation | 1f. JURISDICTION OF ORGANIZATION Delaware | 1g. ORGANIZATIONAL ID #, if any 4187432 ☐ NONE |
|---|---|---|---|---|

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any ☐ NONE |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME | | | | |
| L60, INCORPORATED | | | | |
| OR 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 9633 South 48th Street, Suite 100 | Phoenix | AZ | 85044 | USA |

4. This FINANCING STATEMENT covers the following collateral:

**SEE EXHIBIT "A" ATTACHED HERETO AND BY THIS REFERENCE INCORPORATED HEREIN AS IF FULLY SET FORTH.**

| 5. ALTERNATIVE DESIGNATION [if applicable]: | LESSEE/LESSOR | CONSIGNEE/CONSIGNOR | BAILEE/BAILOR | SELLER/BUYER | AG. LIEN | NON-UCC FILING |
|---|---|---|---|---|---|---|

| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

Delaware Secretary of State  127190.00002

7030189 SC

International Association of Commercial Administrators (IACA)

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

## EXHIBIT "A" TO UCC-1
## FINANCING STATEMENT

Debtor:                **VALADATA ACQUISITION, INC.**

Secured Party:         **L60, INCORPORATED, an Arizona corporation**

This Financing Statement covers the following property:

All assets of the Debtor whether now or hereafter existing, including, without limitation, all of the Debtor's rights, title, and interests in and to all of the following property, wherever located, whether now owned or hereafter acquired or arising, and as the same may now and hereafter from time to time be constituted:

All cash, accounts, accounts receivable, deposit accounts (including, without limitation, inventory, equipment, goods, documents, instruments (including, without limitation, promissory notes), contract rights, general intangibles (including, without limitation, payment intangibles and an absolute right to license on terms no less favorable than those currently in effect among our affiliates, but not own intellectual property), chattel paper, supporting obligations, investment property, letter-of-credit rights, trademarks and tradestyles in which Debtor now has or hereafter may acquire any right, title or interest, all proceeds and products thereof (including, without limitation, proceeds of insurance) and all additions, accessions and substitutions thereto or therefore.

QBPHX\127190.0000Z\2123814.1

WK ORD 425800
FILE NO: 07-000413851-8
DATE: 09/20/2007
TIME: 02.41.51.4 PM
FILING OFFICE: ND SEC OF ST
OFFICER: ALVIN A. JAEGER

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Valerie Fell
CT Corporation System
Dallas UCC Team 1
350 N. St. Paul Street, Suite 2900
Dallas, Texas 75201

FILE NO: 07-000413851-8
NUMBER OF PAGES:     2
VALADATA, INC.    UCC

FEE:      16.00

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| VALADATA, INC. | | | | |

OR 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX

| 1c. MAILING ADDRESS c/o Andrew LB Noah | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1800 Radisson Tower, 201 North 5th Street | Fargo | ND | 58102-4889 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| 45-0460745 | | Corporation | North Dakota | 16914400 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| L60, INCORPORATED | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 9633 South 48th Street, Suite 100 | Phoenix | AZ | 85044 | USA |

4. This FINANCING STATEMENT covers the following collateral:

SEE EXHIBIT "A" ATTACHED HERETO AND BY THIS REFERENCE INCORPORATED HEREIN AS IF FULLY SET FORTH.

8. OPTIONAL FILER REFERENCE DATA
North Dakota Secretary of State 127190.00002

International Association of Commercial Administrators (IACA)

## EXHIBIT "A" TO UCC-1
## FINANCING STATEMENT

Debtor:          **VALADATA, INC.**

Secured Party:   **L60, INCORPORATED, an Arizona corporation**

This Financing Statement covers the following property:

All assets of the Debtor whether now or hereafter existing, including, without limitation, all of the Debtor's rights, title, and interests in and to all of the following property, wherever located, whether now owned or hereafter acquired or arising, and as the same may now and hereafter from time to time be constituted:

     All cash, accounts, accounts receivable, deposit accounts (including, without limitation, inventory, equipment, goods, documents, instruments (including, without limitation, promissory notes), contract rights, general intangibles (including, without limitation, payment intangibles and an absolute right to license on terms no less favorable than those currently in effect among our affiliates, but not own intellectual property), chattel paper, supporting obligations, investment property, letter-of-credit rights, trademarks and tradestyles in which Debtor now has or hereafter may acquire any right, title or interest, all proceeds and products thereof (including, without limitation, proceeds of insurance) and all additions, accessions and substitutions thereto or therefore.

```
FILE NO: 07-000413851-8
NUMBER OF PAGES:      2
VALADATA, INC.      UCC

FEE:        16.00
```

1 of 1



# Exhibit "J"



*Quarles & Brady*
*Streich Lang* LLP

One Renaissance Square
Two North Central Avenue
Phoenix, Arizona 85004-2391
Tel 602.229.5200
Fax 602.229.5690
www.quarles.com

*Attorneys at Law in:*
*Phoenix and Tucson, Arizona*
*Naples and Boca Raton, Florida*
*Chicago, Illinois*
*Milwaukee and Madison, Wisconsin*

To Contact Writer Directly:
Telephone:  602.229.5212
Facsimile:  602.229.5690
E-Mail:  sklundt@quarles.com

September 13, 2007

## VIA UPS OVERNIGHT MAIL/
## FACSIMILE - 805-552-8411

First Data Independent Sales, Inc.
6101 Condor Drive
Moorpark, CA 93021

> Re:  Accounts owed by First Data Independent Sales, Inc. ("First Data")
> to Valadata, Inc.

To Whom It May Concern:

This law firm represents L60, Incorporated ("L60"), which is the holder of a security interest in all accounts receivable ("Accounts") owed to Valadata Inc. ("Valadata"). The Accounts serve as security for obligations owed to L60 under a promissory note made by Pipeline Data, Inc. ("Pipeline"). Pipeline has defaulted on its obligations under the promissory note. As a result, L60 now is entitled to collect the Accounts and to require account debtors and obligors to make payments directly to L60.

L60 has informed us that First Data is such an account debtor/obligor. Pursuant to A.R.S. § 47-9607(A)(1), you are hereby notified that all proceeds and payments that are now owed to Valadata, or which may be owed in the future, should be paid directly to L60, at the following address:

> L60, Incorporated
> Attn: Jason Kujanson
> 14415 S. 50th Street
> Suite 200
> Phoenix, Arizona 85044

Please be advised that, pursuant to A.R.S. § 47-9406(A), you may be liable to L60 for the amount of any payments made to Valadata following your receipt of this notice.

QBPHX\127190.00002\2122413.1

First Data Independent Sales, Inc.
September 13, 2007
Page 2

Should you have any questions, please call me at 602-229-5212.

Very truly yours,

QUARLES & BRADY STREICH LANG LLP

Scott A. Klundt

SAK/lam

Exhibit "K"



One company.
Making global commerce happen.℠

September 21, 20007          via fax 602-229-5690

Scott A. Klundt, Esq.
Quarles & Brady
One Renaissance Square
Phoenix , Arizona 85004-2391

RE: Valadata

Dear Mr. Klundt:

This is in response to your letter of September 13, 2007 to National Payment
Systems, Inc., d/b/a First Data Independent Sales, Inc.("NPS"). NPS  does not
intend to become involved in the dispute between Valadata, Pipeline and L60 and
is not in a position to evaluate the various positions of those parties, including
L60's position as stated in your letter of September 13, 2007.  NPS is merely a
stakeholder.  Without waiving any rights it may have, NPS advises you that, at
present, future payments due Valadata will be withheld.

Sincerely,

Bill H. Abney
Counsel

First Data Corporation
(901) 381-5465 (office)
babney@concordefs.com

Exhibit "L"



One company.
Making global commerce happen.℠

September 21, 20007                    Via email to sheila.corvino@pipelinedata.com

Sheila Corvino, Esq.
811 Dorset West Road
Dorset, Vermont 05251

Re: L60 demand

Dear Ms. Corvino:

I previously provided you a copy of the letter from counsel for L60 ("September 13, 2007
Letter"), wherein L60 directed National Payment Systems, Inc. ("NPS") to remit all payments now
or hereafter due to Valadata to L60. Counsel for L60 provided me with

> --a copy the lawsuit filed against Pipeline and Valadata alleging a default in the
> promissory note and asserting the security interest referred to in the September 13 Letter;
> and
> -- a copy of the promissory note and security agreement which are the subject of the suit
> and the basis for the claim made in the September 13 Letter.

Based on the documentation we have received, NPS must take the claims of L60 as credible and
placing NPS at risk of litigation.

## REDACTED

NPS does not intend to become involved in the dispute between Valadata, Pipeline and L60 as a
participant, or in the role of mediator or arbitrator. NPS is merely a stakeholder. As a result of the
demand made upon NPS by L60, NPS will hold :

that it is no longer asserting its claim against NPS.

Sincerely,

Bill H. Abney
Counsel

First Data Corporation
(901) 381-5465 (office)
babney@concordefs.com

JS 44 (Rev 11/04)

# CIVIL COVER SHEET

**APPENDIX H**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| | |
|---|---|
| **I. (a)  PLAINTIFFS**  CTS HOLDINGS, LLC | **DEFENDANTS**  L60, INC., PIPELINE DATA, INC. and VALADATA, INC. |
| **(b)**  County of Residence of First Listed Plaintiff    **ARAPAHOE**<br>(EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant    **MARICOPA**<br>(IN U.S. PLAINTIFF CASES ONLY)<br>NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE<br>LAND INVOLVED |
| **(c)**  Attorney's (Firm Name, Address, and Telephone Number) 302-654-7444<br>Gregory Williams, Esq., Fox Rothschild LLP, Citizens Bank<br>Ctr, Ste 1300, 919 North Market St., Wilmington, DE  19801 | Attorneys (if Known) 602-229-5212<br>Scott A. Klundt, Esq., Quarles & Brady Streich Lang, LLP,<br>One Renaissance Sq, Two N. Central Ave, Phoenix, AZ 85004 |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of the State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury – Med. Malpractice<br>☐ 365 Personal Injury – Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airlines Reg.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410 |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | **LABOR** | **SOCIAL SECURITY** | ☐ 890 Other Statutory Actions |
| ☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Tort to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | ☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/ Disabilities - Employment<br>☐ 446 Amer. w/ Disabilities - Other<br>☐ 440 Other Civil Rights | ☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 861 HIA (1395 ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br><br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff Or Defendant)<br>☐ 871 IRS – Third Party 26 USC 7609 | ☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Remanded from Appellate Court

☐ 4  Reinstated or Reopened

☐ 5  Transferred from another district (specify)

☐ 6  Multidistrict Litigation

☐ 7  Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. § 1335
Brief Description of Cause
Interpleader

## VII. REQUESTED IN COMPLAINT

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**
Interpleader

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE  12/14/2007

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT #_____    AMOUNT_____    APPLYING IFP_____    JUDGE_____    MAG. JUDGE_____

PHI 1769347v1 12/13/07

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. ‾ 0 7 ‾ 8 1 9 ‾

# ACKNOWLEDGMENT
# OF  RECEIPT  FOR AO FORM  85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____4_____ COPIES OF AO FORM 85.

12/14/07
_____
(Date forms issued)

_____
(Signature of Party or their Representative)

Sophia Siddiqui
_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action